FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

2007 DEC 12  PM 4: 52

CLERK_____
SO. DIST. OF GA.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

AMY KING,                                          )
                                                   )
            Plaintiff,                             )
                                                   )
      vs.                                          )        CIV. ACT. NO. 106-CV-148
                                                   )
CITY OF AUGUSTA, GEORGIA, of Augusta-              )        PLAINTIFF'S
Richmond County, through its Mayor, Deke           )        BRIEF IN RESPONSE
Copenhaver, individually and his official capacity,)        TO DEFENDANTS'
and its Commissioners in their official capacities,)        SUMMARY JUDGMENT
and                                                )        MOTION
                                                   )
GERI SAMS, individually and in her official        )
capacity as the Director of Purchasing for the City)
of Augusta, Georgia,                               )
                                                   )
            Defendants.                            )
_____)

PLAINTIFFS BRIEF IN RESPONSE TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

I.      Introduction to Claims

        Plaintiff  was an employee of Defendant Augusta Richmond-County where she was a

Purchasing Tech in the Procurement Department from September 29, 2003 until November 12,

2003, when Plaintiff alleges she was unlawfully terminated.  Plaintiff brings claims under 42

U.S.C. § 2000-e (Title VII), 42 U.S.C. § 1981, and  42 U.S.C. § 1983 for race discrimination.

She also brings claims under the First and Fourteenth Amendments through 42 U.S.C. § 1983,

for a retaliatory termination for protected speech, and for deprivation of the liberty interest to

1

C:\CLIENT FOLDERS\king\King prima and pretext of prof reasons.wpd

speak on job training topics in an appropriate state provided forum or context, without undue restriction that chills protected speech by termination, and where regulation of speech should be without regard to race.

Defendants are Augusta, Georgia, her former employer, and the Purchasing Director, Ms. Geri Sams, who was Plaintiff's supervisor. Plaintiff alleges Ms. Sams acted in her individual capacity and as a final policy maker under color of law causing deprivation of constitutional rights.

In the race claim under Title VII, Defendant Augusta is an employer covered under Title VII, which has not been disputed.

Defendant Augusta is a local governmental entity, as a "person," subject to liability under 42 U.S.C. § 1983. *Monell v. Department of Social Services*, 436 U.S. 658 (1978). Augusta can be liable for a deprivation of constitutional rights where there is proof that a "policy" or "custom" caused the deprivation. *Owen v. City of Independence, Mo.*, 445 U.S. 622 (1980). Proof of longstanding practice is not necessary, and liability may be based on a single incident. *Id.* Plaintiff asserts that the City may be liable through § 1983 because its probationary employee policy played a causative role in the deprivation of rights or because Ms. Sams can fairly be said to have been acting as a final policy maker, or the policy and the final policymaker combined to cause the challenged deprivation. *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986).

The City is not entitled to qualified immunity. *Owen v. City of Independence, Mo.*

Defendant Sams is the Director of the Purchasing Department of Augusta-Richmond County. (Mills Dep.4, ll. 20-21). Defendant Sams, in her individual capacity, is a person acting under color of law for purposes of 42 U.S.C. § 1983. As an individual she may or may not be entitled to a qualified immunity.

II.     Statute of Limitations Argument

C:\CLIENT FOLDERS\king\King prima and pretext of prof reasons.wpd

A.   Claims Arising from the Same Set of Nuclear Facts Relate Back to Originally Filed Complaint.

Under F.R.Civ.P. 15(c)(2), a claim relates back to the date of the original complaint when the "claim . . . asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original complaint."

B.   Federal Claims

1.   Assume statute begins to run 11/13/03 and a two year statute.

Assume the termination date of 11/13/03 begins the running of limitations period on most claims, except the Title VII claim, and there is not SOL challenge to the re-filed Title VII claim.

2.   First case, 1:05cv038, timely filed 3/11/05, carrying forward all claims deriving from a common nucleus of operative facts.

3.   First case dismissed 4/7/06, and second "case" re-filed 9/20/06, within six months, and therefore timely under § 9-2-61.

Where a timely filed "case," that has been voluntarily dismissed, is re-field withing six months the case is timely filed.  O.C.G.A. § 9-2-61(a)("When any case has been commenced in either a state or federal court within the applicable statute of limitations and the plaintiff . . . dismisses the same, it may be recommenced in a court of this state or in a federal court . . . within six months after the . . . dismissal . . . .").

4.   Claims Actionable that Arose Out of the Conduct Set Forth in First Case, F.R.Civ.P. 15(c)(2), and Substantially Similar Claims May be Brought Under State Law, in Re-Filed Case.

In the re-filed case, a claim may be brought when the claim is substantially the same as a claim(s) in the original action. *Blier v. Greene*, 263 Ga. App. 35, 38 (Ga. Ct. App. 2003).

C:\CLIENT FOLDERS\king\King prima and pretext of prof reasons.wpd

Under F.R.Civ.P. 15(c)(2), a claim relates back to the date of the original complaint when the "claim . . . asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original complaint."

       5.     Federal Law Controls.

To the extent that the state law is more restrictive about what claims are allowed, the federal law controls.

       C.     Claim I – A Race Claim

Claim I in 1:05cv038 is a race claim under Title VII.

Claim I in 1:06cv148 is a race claim under Title VII, 42 U.S.C. § 1981, and pursuant to 42 U.S.C. § 1983, under rights and privileges provided by the Thirteenth and Fourteenth Amendments.

       D.     Claim II – Retaliation for Opposition to Race Discrimination

Claim II in 1:05cv038 is a retaliation claim for opposition to race discrimination under Title VII.

Claim II in 1:06cv148 is a retaliation claim for opposition to race discrimination under Title VII, 42 U.S.C. § 1981, and pursuant to 42 U.S.C. § 1983, under rights and privileges provided by the Thirteenth and Fourteenth Amendments.

       E.     New Claim VI – is Substantially the Same as Claim III

In 1:06cv148 Claim VI, the rights asserted to be violated are First and Fourteenth Amendment rights not to be terminated on a whim without a name clearing hearing.

4

C:\CLIENT FOLDERS\king\King prima and pretext of prof reasons.wpd

In 1:05cv038 Claim III, the rights asserted to be violated are the First and Fourteenth Amendment rights, that included the allegation within the complaint (Doc. 1) that Def. Sams could terminate King using the City's policy that allowed arbitrary termination.

An arbitrary termination by Sams under the authority of a City policy that provided no hearing is no different from a claim saying that a remedy to the arbitrary termination by Sams would have been a hearing.

   F.  Plaintiff waives reliance on Georgia Whistleblower's Act.

III.  Factual Background Information

   A.  Chronology, the Office, Duties and Incidents

Ms. King, who is White, became an employee of the Purchasing Department of Augusta about September 23, 2003.  (King Dec. ¶ 2 & 3) **(Ex. A)**.  Ms .King was the only White in the Department. (Id. ¶ 9).   The Director of the Purchasing Department is Ms. Geri Sams who is Black or an African American.  (Id. ¶ 7 & 8).  Ms. King's supervisor was Doren Holmes, who is Black.  (Id. ¶ 10).  Thelma Brooks, Deborah Williams and Phyllis Mills are Purchasing Techs and all are Black.  (Id.. ¶ 12-14).

Maritza Rodriguez, was the Secretary / Receptionist, is Hispanic. (Id. ¶ 15).  Joane Peredo, worked on quality assurance, and played a major role in the sealed bidding process, is from the Pacific Islands, her skin color is light brown, and she is not Black by race or color.  (Id. ¶ 16).  Any work product of the Department that was for display to other departments, the Commission or the public, was done by Joane Peredo.  (Id. ¶ 17).

C:\CLIENT FOLDERS\king\King prima and pretext of prof reasons.wpd

## Department Solicits Offers,
### Pays for Goods and Services, and Monitors Quality

The Purchasing Department receives requisitions from the other departments to purchase goods or services to be used by the other departments, checks the amounts and the items requested to see if it is appropriate, keeps records about the spending for the goods and services purchased by the City, and ultimately Ms. Sams approves or disapproves requests. (Id. ¶ 18). The Department deals with the vendors whose goods or services may not be meeting contract requirements, and it conducts the sealed bidding process. (Id. ¶ 19 & 20).

## Ms. King's Easily Completed, Entry Level Job
### Processing Small Dollar Requests

Ms. King approved purchasing requests, up to a certain dollar amount, submitted by departments by paperwork or by computer, then forwarded them to superiors for approval. (Id. ¶ 22). Ms. King did nothing with the sealed bid process. (Id. ¶ 23 & 24).

Ms. King usually finished her work early and then asked to help others, or did general tasks others asked her to do. (Id. ¶ 25-27). Ms. Mill told Ms. King no to work so fast. (Id. ¶ 28). Joane and Maritza were busy all of the time and their tasks were not busy work. (Id. ¶ 29). Ms. Mills and Ms. Brooks surfed the internet a fair amount, even though it was not allowed. (Id. ¶ 30-31).

## Ms. King Did Not Work with Confidential Information

During her tenure with the Department Ms. King was not exposed to any confidential

6

C:\CLIENT FOLDERS\king\King prima and pretext of prof reasons.wpd

information about a bid. (Id. ¶ 34). Ms. King's prior experience in the military and law

enforcement gave her an appreciation of confidential information, and she knew that the

information in the sealed bids form vendors was confidential information that should not be

revealed. (Id. ¶ 32-33).

**Brother's Wedding Absence Approved by Sams, Never Mentioned
and Not Reason Legitimately Acting Manager Would Fire King**

The evidence shows that King's absence for her brother's wedding, early in her tenure,

were  approved by management, including Ms. Sams, and no one ever made any complaints

about the approved absence.  The approved absence in early October for her brother's wedding

was not a reason for which Ms. King would have been fired in mid-November by a manager with

legitimate intentions, given the intervening events and circumstances.

Before she was hired, Ms. King was interviewed, and then Doreen Holmes called to offer

her the job.  (Id. ¶ 35).  Ms. King asked Ms. Holmes for permission to go to her brother's

wedding, which meant missing work October 2, 3, and 6, and Ms. Holmes said she would have

to ask Ms. Sams.  (Id. ¶ 36-38).  Ms. King was given management permission. (Id.).

On October 2, 3, and 6, Ms.King attended her brother's wedding.  (Id. ¶ 36-38).  Ms. King

was not paid for the days absent, (Id. ¶ 39) and the approved absence had nothing to do with

accrued leave.

When she returned, neither Ms. Sams, nor any supervisor, ever discussed anything about

this approved absences, including at the time of termination.  (Id. ¶ 40-42).  No legitimately

7

C:\CLIENT FOLDERS\king\King prima and pretext of prof reasons.wpd

acting manager would have terminated King for an absence the manager approved, but a manager

acting with unlawful motive might use the absence as a pre-text to cover an unlawfully motivated

termination, based on subsequent events that caused the unlawfully motivated manager to take

adverse employment action.

Orientation and The County Dress Code Permits Capri Pants

Ms. King attended orientation on about September 29, and was given materials including

a copy of the County dress code.  (Id. ¶ 4 ).  The County Dress Code prohibits "jeans." (Defs. Ex.

D, filed in SJ  mot.).  The County Dress Code does not prohibit capri pants.  (Id.).  The verbal

instructions at orientation were consistent with the written materials.  (Id. ¶ 6).  It is false to say

that King would have been terminated for wearing capri pants consistent with the dress code.

Absence Due to Doctor Verified Illness Requiring Doctor Ordered Absence<br/>that Brought on No Negative Management Comments from Sams<br/>Would Not be Basis Upon Which Legitimately Motivated Manager<br/>Would Terminate Employee

During the week of October 6, plaintiff started getting sick, Thelma heard her coughing

and told her to go home, and by week's end Plaintiff had a bad fever.  (Id. ¶ 43-45).  Plaintiff was

confined to bed all weekend and called in sick Monday morning.  (Id. ¶ 46-48).  Plaintiff was

told by Doreen Holmes and Ms. Sams to stay at home so she would not get anyone else sick, and

Ms. Sams told her to get better.  (Id. ¶ 49).

Ms. King missed four or five days of work and when she returned she brought a doctors

note about bronchitis and the need to stay home, which she may have showed to someone.  (Id. ¶

8

C:\CLIENT FOLDERS\king\King prima and pretext of prof reasons.wpd

51).  At no time during the remainder of her employment did Ms. Sams or any supervisor discuss anything about the absence during mid-October due to physician diagnosed bronchitis and physician backed absence,  including at the time of termination.  (Id. ¶ 52, 54-56).

No legitimately acting manager would have terminated King in mid-November for a physician diagnosed bronchitis, and physician backed absence in mid-October, but a manager acting with unlawful motive might use the absence as a pre-text to cover an unlawfully motivated termination, based on subsequent events that caused the unlawfully motivated manager to take adverse employment action.

King's Refusal to Sign Off on Transcript
of Meeting About HUD Funds that was Changed by Sams,
is Assiduously Avoided as a Proffered Reason for the Termination

The refusal of Ms. King to sign off on the transcript she typed for Ms. Sams is a situation, under circumstances of a legitimately ordered job duty, is a scenario which one would think Ms, Sams would use as a technically correct basis to charge Ms. King with "insubordination," but she did not, because it would have opened a can of worms, that at the time, might have been able to prove with smoking gun evidence, that Ms. Sams had engaged in official corruption or fraud.

In the about the third or fourth week of October, Ms. Sams asked King to type a transcript from a tape of a meeting about whether the money for a construction project was Home Funds or Community Development Block Grant Funds and whether the city had properly arranged for the use of the money one way or another, an expedited bidding procedure, and matters that are even more complex than indicated.  (Id. ¶ 57, 58, 60, 61) (See Ex. 1 and 2 from Sams Dep. re:

C:\CLIENT FOLDERS\king\King prima and pretext of prof reasons.wpd

transcripts prepared for case of Kevin Mack v. Augusta Rich. Co.).  The meetings and phone

conferences involved County officials, including Ms. Sams, a contractor and personnel with

HUD. (Id. ¶ 61).

King wrote the notes by hand at first, (King Dep. Ex. 22) but later typed it on a computer,

typing the remainder of a Friday.  (Id. ¶ 59, 62).  On Monday when she listened to the tape to

compare it with the typed transcript, she noticed that some of it had been changed.  (Id. ¶ 63, 64).

There was no password to use the computer just to type.  (Id. ¶ 65 ).  Ms. Sams was the only one

in the office with an interests in changing anything and was in control of having the transcript

done, supporting the inference that it was Sams who changed the tape.

Ms. King talked to Joane and Doreen about whether she should change the transcript back

to what she heard on the tape, but was told just to finish it. (Id. ¶ 66 & 67).  King and Doreen

concluded that she did not have to sign it.  (Id. ¶ 68).

When it was printed out Ms. Sams was by the printer and she asked Ms. King to sign it

and put it on her desk, but Ms.King said she would not sign it. (Id. ¶ 69-71).

Ms. King was putting Ms. Sams on notice that she was aware of the official corruption in

which Ms. Sams had engaged and that Ms. King could not be ordered to commit illegitimate

activity, even if she was job scared.  It is obvious why Ms. Sams had to wait for a different set of

facts to label as "insubordinate" or "breach of confidential" information, where she could control

the spin on the underlying evidence, and the spin could not be rebutted by readily available

underlying evidence, that would in fact inculpate Ms. Sams, were anyone in-house to question

C:\CLIENT FOLDERS\king\King prima and pretext of prof reasons.wpd

the reason for the termination.

A reasonable jury could find that when Ms. King had gone back and double checked her work, this was one White employee who could present a real problem to Ms. Sams. No only would she not follow every order of Ms. Sams, she was diligent and therefore a threat to expose errors of Ms. Sams.

Ms. Sams assiduously avoided using this "insubordination" of a refusal to be complicit in illegitimate activity as a basis for a termination then or as a proffer now, where at the time the computer might have yielded the changed versions.

Monday Morning Meeting of October 27
That Generated the Grievance of October 30
and Favoritism for Phyllis Mills

In the staff meeting Monday morning, October 27, Ms. Sams got irate and was yelling at the whole staff, although the specific problem about which Ms. Sams was speaking related to an envelope submitted for a sealed bid that was not processed in a timely manner by Phyllis Mills, who had received the envelope, as indicated by her signature. (Id. ¶ 73-77, ; Signature Proof of Delivery King Dep. Ex. 13), also 12-17).

At the direction of Moses McCauley of HR (McCauley Dep. 8 & 9) Rodriguez and Peredo  drafted a formal grievance, which everyone, except Phyllis Mills, signed October 30. (King Dep. Ex. 20).

Sams denied having received information that there was a grievance about her actions, to

C:\CLIENT FOLDERS\king\King prima and pretext of prof reasons.wpd

which the Plaintiff was a signatory, before November 11th or 12th, when Ms. Sams made the decision to terminate Plaintiff.

King asserts that Phyllis Mills would have told Ms. Sams that the rest of the staff was preparing a formal grievance about her, at about the time the grievance was prepared, October 30, at any rate before the termination by Sams of King on November 12.

A reasonable jury could find it implausible in the totality of the circumstances (and where at this stage credibility is reserved and inferences drawn in Plaintiff's favor) in the assertion by Phyllis Mills (and by inference Sams) who received special treatment by Sams and who socialized with Sams, that she would not have told Ms. Sams about the plan or grievance, and who has signed it, at about the time that the grievance was being created.

Mills knew that a grievance was being created, as Peredo asked Mills if she wanted to sign,  but Mills did not want to be a part of it, (Mills Dep. 7 & 8) reflecting that Mills knew about the grievance near the end of October.

Holmes testified that Mills and Sams go out or to lunch together. (Holmes Dep. 21). Sams has not been out to lunch with only Brooks. (Sams Dep. 49).  Sams did not go out to lunch with King.  (Id.).  Sams admitted that in 2007 she and Mills go out to lunch on a regular basis, but she claims that in 2002 that was not the case.  (Sams Dep. 50).

When Holmes was out on sick leave during 2007, she was demoted, and Sams put Mills in her place and restructured the office to take power away from Holmes and give it to Mills.. (Holmes Dep. 4-7).

C:\CLIENT FOLDERS\king\King prima and pretext of prof reasons.wpd

Ms. Peredo testified that Mills was the benefactor of Sams' favoritism (Peredo Dep. 26) and that Mills and Sams got along better than anyone else got along with Sams. (Id. 85 & 86).

On Monday Morning October 27th, Sams yelled at the whole staff about processing sealed bids that were received, but in fact it was Mills who had signed for sealed bid and failed to process it.

A reasonable jury could find that there is a quid pro quo.  Mills provides information about what is happening out in the office, and that Sams, with her interest in maintaining control, treats Mills specially for that information.  In the totality of the circumstances a reasonable jury could find that Ms. Sams knew about the grievance and King's participation before the termination.

Ms. Holmes believes that Mills would have told Ms. Sams about the petition within a few days, and that Mills is a source of information to Ms. Sams, because they are pretty tight. (Holmes Dep. 2021).

Sams claims that Mills did not talk to her about the grievance until after the investigation by Fort Gordon EEO personnel (Sams Dep. 51-52) where those interviews were done November 17-21.  (There is a portion of the external investigation in Ex. 37 attached to the King Deposition, or as part of the composite exhibits.  Exhibit 37 is not Bates numbered.  The Investigation is at pages 33-42). The circumstances add to the conclusion that Mills would have been motivated to tell Sams in light of the upcoming investigation by outsiders.

On November 25, when Ms. Sams was absent, she left Mills and Homes in charge,

C:\CLIENT FOLDERS\king\King prima and pretext of prof reasons.wpd

whereas before, she would leave Peredo and Holmes in charge. (Ex. 37, p. 42). Holmes signed

the grievance (King Dep. Ex. 20) and is Black. (King Dec.¶ 10).

Ms. Peredo complained that Ms. Sams "made up stuff" in her evaluations in 2004, after

the grievance and investigation. (Peredo Dep. 27).

King's Seeking Guidance About Moving the Furniture
Not An Issue at the Time

Near the end of October, Maritza, who was pregnant, wanted to move some furniture

because of a new printer. (King Aff. ¶ 85, 86, 88). Maritza needed help so King helped her. (Id.

¶ 87). They could not get the furniture situated in such a way that the power cord to the printer

was in a safe place. (Id. ¶ 89). Mr. Brooks came by and noticed the cord and the women moving

the furniture, so he helped, but he had to leave. (Id. ¶ 90 & 91).

Ms. Sams came in and told them they needed to move the furniture because of the power

cord. (Id. ¶ 92-94). Ms. King said they would move it however she wanted, seeking guidance

and a suggestion, and saying it in a normal tone. (Id. ¶ 95, 98). Mr. Brooks had come by and

heard Ms. Sams speaking in a conversational tone. (Brooks Aff. 4 & 5). Mr. Brooks' affidavit

does not back as assertion that Ms. King was insubordinate.

Ms. Sams did not say anything at the time about the way Ms. King had spoken to her, and

went back to her office. (King Aff. ¶ 94-99).

After the furniture was moved Ms. King went to Ms. Sams' office and asked her if she

wanted to check the moved furniture, but Ms. Sams did not. (Id. ¶ 100). Ms. Sams did not bring

C:\CLIENT FOLDERS\king\King prima and pretext of prof reasons.wpd

up anything about Ms. King being insubordinate.

Insubordination is an offense for which one can be immediately terminated. Drawing the inferences in Plaintiff's favor the inference is that Ms. Sams' own racism perceived that Ms. King was being disrespectful based on race, and she used this subjective, past evidence as a pre-text to terminate King in mid-November.

At the time of the termination Ms. Sams said nothing about the alleged insubordination, and if there were two instances of alleged insubordination, it is implausible that something would not have been said at the time, especially where King's actions were open and in the office or in the classroom that were more or less public.  All Ms. Sams said at the termination was that she was letting Ms. King go,  (McCauley Dep. 24)(King Dec. ¶ 142-47) even though King asked a couple of times as to why, the only answer given was just that she was letting her go.

In a document created by Ms. Sams for her prior attorney, Mr. Frails, she says that the issue was not one of insubordination, but it was a safety issue and that they had ignored Mr. Brooks..  (Sams Dep. 60-61, Ex. 5).  In the entry for October 30, Ms. Sams does not even use the word insubordination.  (Id. Ex. 5).  She mentions nothing about tone that might imply insubordination.

C:\CLIENT FOLDERS\king\King prima and pretext of prof reasons.wpd

The Capri Pants (That Were Portrayed as "Jeans" – Which is a Violation of the Dress Code)
Were Permitted by the County's Dress Code and Plaintiff Only Wore The Capri Pants
on the Day She Later Learned of Ms. Sam's No Capri Pants Rule,
and At the Time, Ms. Sams Excused the Capri Pants

On about November 4 Plaintiff wore capri pants to work. (King Dec. ¶ 102). She did so

because the County Dress Code and the orientation in late September put her on notice that capri

pants were not prohibited. (Id. .¶ 4-6).

The policy states, "Dresses, skirts, skorts, shall be no more than 3 inches in length above

the knee." (Ex. D, Def. Exhibits SJ mot.). There is no evidence in the record that Ms. King's

capri pants were even at, or above the knee. (King Dec. ¶ 104 & 105).  There is no evidence that

they were of denim or appeared to be jeans. (King Dec. ¶ 103, 106 & 110).

Defendants have pointed to no rule that lets the Department head set his or her own dress

code, and even if that were the case the would be due process issues with such a rule, unless both

rules were applied in a manner that provided due process and they were not arbitrarily or pre-

textually administered.

When Plaintiff came to work that day fellow employees warned her about Sams' rule of

no capri pants. (King Dec. ¶ 107-08). The Plaintiff mentioned this was not in the dress code.

(Id. ¶ 109).

Ms. King was following the dress code and the orientation she had received when she

wore the capri pants to work one day, and was warned by other employees about Ms. Sam's rule

before Ms. Sams came to work.

C:\CLIENT FOLDERS\king\King prima and pretext of prof reasons.wpd

When Ms. Sams came to work, King apologized and then met with Ms. King, and apologized some more, and said that she would go home an change, but Ms. Sams, said no, and just told Ms. King not to do it again.  (King Dec. ¶ 102-116).

When Ms.King was meeting with Ms. Sams about the capri pants, Ms. King did not know where this rule was coming from, and it did not matter to Ms. King, because Ms. King was "new, she's my boss, I do what I'm told.  If she tells me she doesn't want me to wear capris in the office, I don't' wear capris in the office . . . ."  (King Dep. 47).

When Ms. Sams created Exhibit 5, attached to her deposition, she was trying to justify her actions consistent with the County Dress Code, the statement was written to create the impression that on November 3 or 4, Ms. King was wearing "jeans."  (See Bate 57 of Ex. 5).  The County Dress Code prohibits "jeans." (Defs. Ex. D, filed in SJ  mot.).

From discovery, Plaintiff anticipated that the capri pants allegation would come up. Plaintiff wore the capri pants to her deposition (King Dep.  45) and the deposition of Ms. Sams. Ms. Sams claimed that the capri pants the Plaintiff wore to the depositions were "not the ones that she has on today."  (Sams Dep. 128).  More notably Ms. Sams said that she did not have these on the day "she was in violation of the code,"  (*Id.*) implying that other "capri" pants would violate the code.

A reasonable jury could conclude that a legitimate employer would not have fired Sams on November 12 for the capri pants she wore on November 4, where at the time Plaintiff was acting consistently with the formal Code and where she pardoned the wearing on the 4th because

17

C:\CLIENT FOLDERS\king\King prima and pretext of prof reasons.wpd

she did not know the rule, no employer would inconsistently apply the rule and terminate her

unless some other motivation were at hand.

The Real Topic of King's Questions During and After
the IFAS Training Class that Were the True Reason Sams Terminated King,
and Sams' Assiduous Avoidance of the Real Topic of King's Question in the IFAS Class
and Obfuscation of the Topic of King's Comments to Her Trainer Peredo in the Office After the
Class

With the inferences favorably drawn, a  reasonable jury could find that a substantial

motivating factor for Sams to terminate King is the fact that the new White employee questioned

Sams during the IFAS class on November 11, because it was a public violation of the rule that

Whites cannot question Sams, like the Blacks, or an example of the fact that Sams treats Blacks

more fair than Whites.

A jury could find, regardless of the conflict as to what it was that Plaintiff was talking to

Peredo, or whoever, about after the class in the office when she was overheard by Sams, that

Sams has turned into her proffer as to why the Plaintiff was terminated, that the real reason for

the termination was the question in the IFAS class on November 11. Peredo had held the position

Plaintiff had held and was a legitimate source of information.  (King Dep. Ex. 4).  Plaintiff, a

trainee, could not ask Sams or other employees how to do her job, which is race related condition

upon her training that violates 42 U.S.C. § 2000e-(m).

It is telling that Sams does not use the speech from the class to terminate the Plaintiff, as

that was the speech that embarrassed her and made her mad.  Yet it is undisputed that when Sams

allegedly heard the Plaintiff in the office talking about matters she was allegedly told not to talk

18

C:\CLIENT FOLDERS\king\King prima and pretext of prof reasons.wpd

about in the class, and is the speech proffered as a reason the Defs. would have terminated

Plaintiff any way, Sams took no action whatsoever to stop the Plaintiff from divulging this

allegedly confidentail information, whether it was sealed bid information , or whether it was the

fact that a department was having problems with a vendor.  Sams had to use the disclosing

confidential information in the office to avoid having to address the underlying topic of a

legitimate question about a procedure she suggested that conflicted with written materials.  The

topic that motivated the Plaintiff to ask the question in the class, that is whether the procedure for

requistion of funds for employee awards in departments should go to Sams or Payroll, is more

likely a question a trainee would ask someone who held the position.  We know that the question

made Sams angry in the class, but there were may witness to what happeened in the class so she

had to pick an incident where she could more easily control the spin on the topic.  However,

there is an inconsistency in her actions, because if Plaintiff was divulging confidential

information in the office, then why didn't Sams stop her.  The real reason Sams did not stop the

Plaintiff when she was speaking in the office is that Plaintiff was not talking about anything other

than the question of  whether the procedure for requisition of funds for employee awards in

departments should go to Sams or Payroll, which is linked to a violation of the Whites cannot

question the power and authority of Sams, and is a race related issue, because Blacks get treated

"more fair" when it comes to questioning Sams.       The Defs, argument tries to conflate the

speech and topics in the class and the speech after the class, but if you are referring to the speech

about the question Plaintiff asked, it is protected either place. Plaintiff says the topic, is the

question of  whether the procedure for requisition of funds for employee awards in departments

C:\CLIENT FOLDERS\king\King prima and pretext of prof reasons.wpd

should go to Sams or Payroll, whether in the class or in the office.  Sams has shifting reasons, but

none related to the question of Plaintiff.  Sams are some variation of a twist on confidential

information, which in this department is legitimately only the sealed bid information, to now the

vague and general, "a comment about a user department during the IFAS meeting."  Attached

here is the portion of the Plaintiff's deposition, where, under cross-examination, she does a good

job of debunking the conflation and attempt to turn the IFAS class into a discussion about

WMD's and national security.  (**Exhibit B**, King Dep. 73-96).

Even if the speech (questioning Ms. Sams) is not "protected speech" in the First

Amendment sense, where the speech is a job duty or benefit that Blacks have which Whites do

not have, then  under Title VII, § 1981, or the Thirteenth and Fourteen amendments through §

1983, because there are limitations on the speech that are race related, adverse employment

action by a public official based on the speech is prohibited race discrimination, even if the

speech is not First Amendment protected speech by content or topic alone.

The County had a computerized requisition system, and on November 11 Ms. Sam's

directed King to attend a class about the system, that was also attended by employees from other

user departments, whose requisitions the purchasing department handled.  (King Dec. ¶ 117-

119).  Written materials were passed out that included the policies and procedures about which

Ms. Sam's and others would speak (Id. ¶ 120-21).

During the class, discussion became informal and a person from a department was asking

how to requisition payment for a gift certificate or an award to an employee in the department.

C:\CLIENT FOLDERS\king\King prima and pretext of prof reasons.wpd

(Id. ¶ 122). Ms. Sams instructed the class that a request for an award or similar purchase for an employee should be brought directly to her. (Id. ¶ 123).

Ms. King was looking through the written materials and found a section that indicated the payments for gifts or bonuses should go to the payroll department. (Id. ¶ 124-25). The payroll department keeps track of payments to the County employees. (Id).

Ms. King spoke up and said that was not with the materials said. (Id. ¶ 126).

Ms. Sams looked angry, she stopped and looked at Ms. King, and the room got quiet. (Id. ¶ 127-28).

Ms. King thought the method stated by Ms. Sams sounded the illegal because it was not consistent with the written rules. (Id. ¶ 129).

Ms. Sam said she would talk to Ms. King about it later, but she never did. (Id. ¶ 130).

There was no confidential bid information discussed in the class, and there was only some general information about a vendor or two who had problems with their goods and services. (Id. ¶ 132). Ms. King was concerned about learning how to do her job and how to deal with a request from a department for a gift certificate, an award or some benefits for employees, and whether it should be referred payroll or to Ms. Sams. (Id. ¶ 132).

When Defendants quote Ms. King as saying she thought she made a mistake, that comment has to be considered in the light most favorable to Plaintiff, which is that Plaintiff crossed Ms. Sams' line as to race or power, and is not an admission that Plaintiff was insubordinate.

21

C:\CLIENT FOLDERS\king\King prima and pretext of prof reasons.wpd

A reasonable jury could conclude that when the new White employee legitimately questioned Ms. Sams in the class, it was an affront to Ms. Sam's discriminatory racial sensitivities, and was a motivating factor for Ms. Sam's actions on November 11th and 12th.

More importantly, where the defendants are trying to argue in the brief, by obfuscation, that plaintiff was terminated for comments she made during the class as being "embarrassing" or "insubordinate", no proffer has been made by Ms. Sams, as a matter of evidence, that she terminated King for the comment she made in the class. The evidence reflects that Ms. Sam's testified that she was terminating plaintiff for what she said after the class, in the office, labeling it as a breach of confidential information, and now arguing through a hearsay statement from Moritz or Rodriguez, in order to counter the attack that the information discussed was not confidential information, that King was "fired . . . because Ms. King made a comment about a user department after an IFAS training meeting." (Brf. of Defs. at 22).

After the IFAS class, King went back to the office to ask her trainer Joane Peredo about the question she had during the class, about the appropriate way to handle requests by departments to get city funds to fund awards for employees. (King Dec. ¶ 133). King explained the question and pointed out the policy to Ms. Peredo, and asked her what to do in that situation. (Id. ¶ 134). Ms. Sam's office was in hearing distance of where plaintiff was talking to Ms. Peredo and apparently Ms. Sam's heard them. (Id. ¶ 135).

Doreen Holmes never remembers Ms. Sams giving an instruction during an IFAS meeting that "What's discussed in here stays in here." (Holmes Dep. 12). The only confidential information in the department is the sealed bid information. (Holmes Dep. 10-11). Everything

22

C:\CLIENT FOLDERS\king\King prima and pretext of prof reasons.wpd

else is open to the public. (Id. 11).

If Ms. King had been talking about confidential information or about information that she was not supposed to talk about, then a reasonable jury would expect that new Sam's would have stepped instep in and stopped further conversation, however Ms. Sam's did nothing to stop the conversation. (Id. ¶ 136-37).

The question Plaintiff was asking is Peredo was not confidential information. (Id. ¶ 138). It was the same question Ms. King had asked in the class and had apparently crossed Ms. Sams' racial sensitivity barrier. (Id. ¶ 139).

Ms. King did not stand in the middle of the office and reveal genuinely confidential information, nor did she reveal any information that was not public information, nor did she mention the department that had asked about the gift or award requisition process. (Id. ¶ 140 & 141).

The Termination and the Termination Meeting

Ms. Sam's contacted Mr. McCauley in the HR department and informed him that she had an employee she was going to have to let go. (McCauley Dep. 24).

Mr. McCauley tried to inquire as to the "circumstances," and Ms. Sam's reply was, "isn't there a policy that says we can release an employee without reason?" (Id.). Mr. McCauley replied that there was, and Ms. Sam's indicated that's what she wanted to do. (Id.). Mr. McCauley re-questioned Ms. Sams about whether that was what she really wanted to do and she replied that it was. (Id.).

C:\CLIENT FOLDERS\king\King prima and pretext of prof reasons.wpd

Ms. King was summoned to the office and basically knew Sands told her that she was "letting her go, I belief that term was." (Id.).

Ms. King asked missing and it's why a couple of times in his same said she did not have to give a reason but she said that they no longer needed her services. (King Dec. ¶ 144). Ms. Sam's did not mention anything that Ms. King allegedly had done wrong. (Id. ¶ 146). Ms. Sams did not mention anything that she had overheard Ms. King say. (Id. ¶ 147).

At the time of the termination Ms. Sams gave no reason, even though she was asked by Mr. McCauley in private, and by Plaintiff. A jury could find the failure to give a logical reason and hide behind a policy is suggestive of a prohibited reason versus a legitimate reason.

IV.    Prima Facie Race Case

A.    Reverse Race Discrimination (and the Mixed Motive of Protected Speech with the Protected Act of Employee in Training Asking Questions about Lawful Procedures) Where Training May not be Infected with Racially Discriminatory Barriers.

1.Reverse Race Discrimination (Title VII, § 1981, and the Thirteenth and Fourteenth Amendments (under § 1983)

The is a reverse race case and the Plaintiff therefore need not show that she was replaced by a Black.

The first theory of relief is that the Def. employer City and Def. Sams in her policy maker and individual capacities, terminated King on account of her race, where race was a motivating factor. This is claim is based on the fact that Ms. Sams treated Blacks "more fairly" than Whites, and in particular Def. Sams imposed harsher, subjective standards of the

24

C:\CLIENT FOLDERS\king\King prima and pretext of prof reasons.wpd

communications and questions of Whites in the workplace, than the standards applied to evaluate

the communications of Blacks, without imparting adverse employment action upon the Blacks,

while imparting adverse treatment to the White.  42 U.S.C. § 2000e-2(a) (1).

     The second theory is a challenge to the subjective standard imparted by Ms. Sams in the

termination of the Plaintiff, under the City's personnel rule that allows the termination of a

probationary employee for any reason or no reason at all, under the direction and subjective

application of Ms. Sams, where the probationary employee is classified in such a manner that

"tends to deprive" White individuals of employment opportunities, by use of the no reason or any

reason termination policy of the City by Sams.  42 U.S.C. § 2000e-2(a)(2)(cannot limit, segregate

or classify employees or applicants . . .  in any way which would deprive or tend to deprive any

individual of employment opportunities or otherwise adversely affect his status as an employee,

because of such individual's race, color, . . . or national origin.").  Also, the probationary

employee policy places the probationary employee in an on-the-job training program, and when

Defs. Sams and the City place more harsh terms of employment on the performance of the

probationary employee than it does for full time employees with race as a motivating or

determining factor, it violates 42 U.S.C. § 2000e-2(d).  The probationary employee program is

being implemented by Sams to establish harsher goals for employment by making the White

employee forfeit the term and condition of Black employees that enables them to ask legitimate

questions and learn and do their jobs, whereas the White employee in the training or probationary

period cannot ask questions legitimately related to effective and efficient performance of job

functions, impeding and establishing a barrier for the White employee to learn how to

C:\CLIENT FOLDERS\king\King prima and pretext of prof reasons.wpd

legitimately perform the job, which is in effect a prohibited training program. 42 U.S.C. § 2000e-

2(d):

This is an appropriate case to use a disparate impact analysis given the city's policy at

probationary employees can be terminated for any reason, in combination with the evidence that

Sam's was harder on Whites, and that Whites could not question Sams without her racial hackles

being raised.  In *Watson v. Ft. Worth Bank & Trust*, 487 U.S. 977, 990-991 (U.S. 1988) the Court

stated:

> If an employer's undisciplined system of subjective decision making has
> precisely the same effects as a system pervaded by impermissible intentional
> discrimination, it is difficult to see why Title VII's proscription against
> discriminatory actions should not apply. In both circumstances, the employer's
> practices may be said to "adversely affect [an individual's] status as an employee,
> because of such individual's race, color, religion, sex, or national origin." 42 U. S.
> C. §§ 2000e-2(a)(2). We conclude, accordingly, that subjective or discretionary
> employment practices may be analyzed under the disparate impact approach in
> appropriate cases.

In *Mastro v. Potomac Elec. Power Co.*, 371 U.S. App. D.C. 68 (D.C. Cir. 2006) the Court

addressed the kind of evidence that establishes a prima facie case in a reverse discrimination

case.

> [W]e have expressly rejected as immaterial a requirement that the plaintiff
> be replaced by an individual outside her protected class. Id. at 412-13; *Stella*, 284
> F.3d at 146. The plaintiff need only show that the position continues to exist and
> was filled--sufficient proof that the position was not simply eliminated.
>
> In the context of reverse discrimination claims, the prima facie framework is
> tweaked once more. . . . This "background circumstances" requirement modifies
> the first prong of the prima facie framework; it "substitutes for the minority
> plaintiff's burden to show that he is a member of a racial minority." Id. . . .
>
> Two general categories of evidence constitute "background circumstances." The
> first is evidence indicating the particular employer "has some reason or inclination

C:\CLIENT FOLDERS\king\King prima and pretext of prof reasons.wpd

to discriminate invidiously against whites." *Harding*, 9 F.3d at 153. Within this category, we have found sufficient such evidence as political pressure to promote a particular minority because of his race, pressure to promote minorities in general . . . The second category is evidence indicating that "there is something 'fishy' about the facts of the case at hand that raises an inference of discrimination." *Harding*, 9 F.3d at 153. Within this category, we have found the following circumstances sufficient: evidence that a plaintiff was given "little or no consideration" [*852] for a promotion and that the supervisor never fully reviewed . . . and evidence that a minority applicant was promoted over four objectively better-qualified white applicants "in an unprecedented fashion," *Bishopp*, 788 F.2d at 786. A plaintiff may establish "background circumstances" by proffering evidence from either of the two general categories; evidence from both is not necessary. *Harding*, 9 F.3d at 153. Additionally, such circumstances may arise from either the employer's general background or the background of the case at hand. Id. . . . and the general understanding that the plaintiff's burden of establishing a prima facie case of discrimination under the McDonnell Douglas framework is "not onerous." *Burdine*, 450 U.S. at 253.

### Evidence that Race Was a Motivating Factor in the Termination

The evidence shows that Ms. Sanders was harsher on why it's and that in particular she objected to whites, or non blacks, who questioned her.  The evidence showed that on November 11 Ms. King questioned Ms. Sams, asking a legitimate question tied to possible fraud, waste or abuse, that Ms. King later that day was discussing the same topic, which questioned Ms. Sam's, and that one day later, Plaintiff was terminated with race as a motivating factor on November 12, using an employer policy that allowed a complete subjective based, arbitrary termination by Sams in her individual an official capacity as a policymaker, where Sams did not abide Whites who questioned her and she supervised a shop that was harsher on Whites.

The temporal proximity between the acts, of the Plaintiff, which triggered the race-based reaction of the Defendant, and the ultimate adverse action, are extremely, temporally close and therefore there is direct evidence of a causal connection between race as a prohibited factor and the adverse action of the termination sufficient to establish a prima facie case.  *Garrett v. Univ. of Ala. at Birmingham Bd. of Trs.*, 2007 U.S. App. LEXIS 26476, 24-25 (11th Cir. 2007) ("[t]he cases that accept mere temporal proximity between an employer's knowledge of protected

C:\CLIENT FOLDERS\king\King prima and pretext of prof reasons.wpd

activity and an adverse employment action as sufficient evidence of causality to establish a prima

facie case uniformly hold that the temporal proximity must be 'very close.'" *Clark County School*

*Dist. v. Breeden*, 532 U.S. 268, 273, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001)");  *Spiegla v.*

*Hull*, 371 F.3d 928 (7th Cir. 2004) (officer demonstrated by a preponderance of the evidence that

her comments to the assistant superintendent were a motivating factor in her transfer and shift

change because only four days, including a weekend, passed between the conversation and the

officer's transfer and schedule change after seven years of uninterrupted postings on the prison gates.).

Even if the evidence is not direct evidence the circumstantial evidence establishes a prima

facie case that race played a motivating factor in the termination.

Ms. Rodriguez's affidavit supports the conclusion that in general Ms. Sam's gave

preferential treatment to the African-Americans.  Ms.. Rodriguez affidavits states that she "was

more fair to African-American men and women." (Rodriguez Aff. ¶ 7 ).  The converse inference

would be true, that Whites were treated more harshly.

Ms. Rodriguez's affidavit supports the conclusion that the degree of harshness of Ms.

Sam's  reaction to someone  who questioned her had an unlawful racial component in keeping

with the general preferential treatment of African-Americans.  In paragraph 4, Ms. Rodriguez

states that "we," which a reasonable jury would conclude to reference those who were not Black,

and states, "However, we were not allowed to question Ms. Sam's authority the way Doreen

Holmes, Deborah Williams, and Phyllis Mills were allowed to do."  (Rodriguez Aff. ¶ 4).

Doreen Holmes, Deborah Williams, and Phyllis Mills are African-American.  (King Dec. ¶ 10,

13, 14).

The position held by Plaintiff was the token White spot, reflecting that race played a

factor in employment decisions.  In March of 2002 there were three Black women, one Puerto

Rican (Rodriguez), one Filipino (Peredo) and one White (Bedenbaugh), (Peredo Dep. 81-83) and

C:\CLIENT FOLDERS\king\King prima and pretext of prof reasons.wpd

after Mary Bedenbaugh left, then King, another White filled the spot. (Id. 84). King was

replaced by another White, Jessica Dieuto in about December 2003 or January 2004. (Peredo

Dep. 90). Jessica quit before Peredo quit, (Peredo Dep. 90) and Peredo quit in February 2005.

(Id.19).

Doreen Holmes, who has been with the Purchasing Department since 1996, (Holmes

Dep. 7 & 8 ) testified that there has never been more than one White in the department. (Holmes

Dep. 9). Def. Sams became the head of the Purchasing Department in about 2000. (Sams Dep.

6) (Holmes Dep. 7 & 8 (1996; Sams as Dept. head)). Nancy Williams now holds the token

White position. (Holmes Dep. 6). A reasonable jury could find that Ms. Sams has a *de facto*

racial quota system in place, and that she always wants to have at least one token White.

Because race is a factor in hiring, it could be a factor in other employment decisions. A

reasonable jury could conclude that race played a part in the termination of Plaintiff.

A reasonable jury could conclude that under Sams, the Purchasing Department is more

hostile to persons who are not Black. The Defs. have produced the affidavit of Maritza

Rodriguez who says that Sams was "more fair to Blacks" (Rodriguez Aff. ¶ 7) and that non-

Blacks cannot question Sams. (Id. ¶ 4). The Black employees, and there respective start dates

are Doreen Holmes - 1996 (Holmes Dep. 7) Brooks - 1999, (Brooks Dep. 4) and Mills - 1999.

(Mills Dep. 4). The prior two paragraph reflect that the token White seat is vacated (and filled)

frequently. Peredo, a Filipino, was in the Department from March 2002-2005. (Peredo Dep. 19).

When Peredo was hired, there were no Whites, although Maritza was there, and Maritza was in

Purchasing from 2001 to 2004. (Rodriguez Aff. ¶ 2).

Maritza and Joane had more task and responsibility than the Blacks. While there was a

general hostile work environment, the environment seemed harsher for me, and lighter skinned

women, Maritza and Joane. (King Aff. ¶ 148).

C:\CLIENT FOLDERS\king\King prima and pretext of prof reasons.wpd

Ms. King was an excellent performer and got along well with others.  Ms.King was an excellent worker, technically proficient, and got along well with the other employees in the office. (Id.¶ 149). Her supervisor, Doreen Holmes, never counseled her nor advised Ms. King that she had been doing anything wrong.  (Id.¶ 150).  None of the other employees ever made any complaints about her to anyone.  (Id.¶ 151).

Ms. Sams subjected Ms. King to other terms and conditions that were harsher and race based.  Ms. Sams would not let Ms. King open her window but the other employees could.  (Id.¶ 152).  In about the third week King was told by Ms. Sams that her food was "stinky" and that she could not bring it into the office, where everyone else brought their food.  (Id.¶ 153).  Every day, King was  watched and examined by Ms. Sams, for more than her work performance and she made King feel that she had to watch every word.  (Id.¶ 154-55).

The evidence shows Plaintiff suffered an adverse action connected to race.

Joane Dieuto filled the position, as the token White.

The evidence shows that on November 11 Plaintiff questioned Ms. Sam's in the IFAS meeting about the legitimate way to requisition funds for awards to employees in other departments.  After the class Plaintiff was talking to Joanne or another person within the office, about the same question, and was apparently overheard by Ms. Sams.

Ms. Sam says she terminated Plaintiff for the conversation Plaintiff had with someone in the office after the class, however there is a dispute about the topic of that conversation.

It is plaintiffs position at a reasonable jury could find that plaintiff was terminated for the question during the class and /or the conversation after the class in the office.

It is how we'll ever undisputed, but the next day, using the City's policy that enables a Department head, or anyone with a capacity to terminate, to fire a probationary employee for any

C:\CLIENT FOLDERS\king\King prima and pretext of prof reasons.wpd

reason or no reason at all, Ms. Sam is met with McCauley, can use the policy to terminate the Plaintiff, saying she was letting her go, without reason stated.

The termination is clouded with race and follows very closely on the heels of the actions by Plaintiff that drew the negative race related adverse action by Def. Sams to terminate Plaintiff the next day.

None of the proffered reasons were the subject of a prior disciplinary action of any sort.

V.     Prima Facie Case Under the First Amendment

A.     Protected Speech

The IFAS class was the publicly provided forum in which questions about procedure and process would be legitimately asked and protected as part of a classroom learning process. *Garcetti v. Ceballos*, 126 S.Ct. 1951, 1961 (2006) indicated that governments should provide fora where job related speech is protected, even if it is not about a matter of public corruption, fraud, waste or abuse.

Plaintiff's question inside the IFAS class was "classroom instruction" protected under *Garcetti*, 126 S.Ct. at 1962. A classroom was the appropriate place, and the speech had to be raised then to be raised in a timely and meaningful manner, and the conflict was a conflict, and could be spoken no other way, but at the risk of mis-information and defeat of the purpose of the classroom and training, and legitimate governance.

The question in and of itself was protected speech because it challenged possible official corruption, that instructed that a payment procedure verbally proffered was legitimate, whereas the written materials contradicted the verbally instructed method. (King Dep. 75-96). *Garcetti* allows regulation of job related speech that is not overly broad, or that stifles insider job speech by overly harsh punishment. *Garcetti* did not hold that ordinary job speech that is on a matter of

31

C:\CLIENT FOLDERS\king\King prima and pretext of prof reasons.wpd

public concern can lead to termination, but that ordinary job speech can be regulated, but not to the point that public employment is conditioned on the right to ask questions about governmental action that may not be legitimate.  Sams was instructing others outside of the Purchasing Department (List of other attending, King Dep. Ex. 19) about a method of payment that conflicted with written policy, which deserved at least a sound and reasoned explanation for all present.

The defendants considered the class an "open meeting" and more or a statement in public versus a statement within the department or workplace.  (King Dep. 76, 162, 168).

In the class, Plaintiff asked the question of Ms. Sams, relying on the printed rule, about whether a department requisitions funds for a cash award or benefit for an employee through Ms. Sams or through payroll.  Ms. Sams became angry and stopped and looked at Plaintiff.

After the class, in the office, plaintiff went to the person who formerly held her position, and asked the same question.

Plaintiff had an objectively based good faith belief that the question raised matter of possible fraud, waste, or abuse, in that Plaintiff was relying on printed materials to ask the question, where the materials conflicted directly with the instructions being given personnel in other departments by Ms. Sam.

Plaintiff was terminated a day later, where the defendants allege that she was terminated for the conversation in the office.  There is a conflict of fact which must be resolved in plaintiffs favor that the topic of the discussion in the office related to the question asked in the class. further independently plaintiff asserts that the question in the class is also protected activity as is the same topic in the office.

There is extremely close temporal proximity between the protected speech and the adverse action.

C:\CLIENT FOLDERS\king\King prima and pretext of prof reasons.wpd

B.      Pickering Balancing

In the balance, the governmental employer cannot show that Plaintiff's question was not legitimate or that it was done in such a way as to pose a legitimate and genuine this corruption of the  training in the classroom or the training in the office.

If Plaintiff's speech in the office were such a disruption, then why did Ms. Sam's not take any action at the time to stop it.  If the defendants now turn around and try to assert a disruption, this new reason will be yet another shifting reason.

Even Phyllis Mills agreed that public employees can speak out about possible fraud, waste and abuse, and that a person in training about a process should be able to ask a question about process.  (Mills Dep. 43).

A public employer needs to demonstrate that the employee's speech detrimentally impacted working relationships within the agency. *Brasslett v. Cota*, 761 F.2d 827, 845 (1st Cir. 1985).

Where the intent of the receiver of the speech proffered to be protected is charged with race discrimination and retaliation for free speech as a basis for the subsequent adverse treatment, unless the employer has shown clear, undisputed disruption of the workplace, versus the subjective reaction of the individual supervisor, then the resolution of the intent issue should go to the jury.  Ms. Sam's individual reaction, which may be based on prohibited motive, are an insufficient basis to find workplace disruption in this case.

If the workplace were really disrupted, by what King was saying in the office after the class, then where Sams has a duty as the Department head to prevent workplace disruption, did she not intervene and stop the alleged disruption? Either there was no disruption and Plaintiff was legitimately asking a question, the allegation of disruption is borne of Sams' own prohibited motive.

C:\CLIENT FOLDERS\king\King prima and pretext of prof reasons.wpd

VI.     Mixed Motive.

This case should reach the jury as a mixed motive case. See e.g., *Desert Palace v. Costa*, 539 U.S. 90 (2003). The mixed motives are race, speech and alleged legitimate reasons.

VII.    Liability of the City and Sams as a Final Policy Maker.

Under the Title VII claim the City can be liable as a covered employer with 15 or more employees.

Under 42 U.S.C. § 1983, for deprivation of First Amendment rights, Augusta can be liable for a deprivation of constitutional rights where there is proof that a "policy" or "custom" caused the deprivation. *Owen v. City of Independence, Mo.*, 445 U.S. 622 (1980). Proof of longstanding practice is not necessary, and liability may be based on a single incident. *Id.* Plaintiff asserts that the City may be liable through § 1983 because its probationary employee policy played a causative role in the deprivation of rights or because Ms. Sams can fairly be said to have been acting as a final policy maker, or the policy and the final policymaker combined to cause the challenged deprivation. *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986).

Even though Plaintiff does not need to show a practice or custom, the evidence of Mr. McCauley would support a jury conclusion that the use of this policy to terminate probationary employees for any reason, is used frequently enough for Mr. McCauley to have testified as to typical or usual practices about the use of the termination of probationary employee policy. (McCauley Dep. 15 & 16).

It is undisputed that Ms. Sam's relied on the policy that allows for termination of probationary employees for any reason. (McCauley Dep. 15 & 16).

The challenged policy, in combination with Ms. Sams' actions were the causative factor of the termination and deprivation of rights, where § 1983 is a causation statute.

34

C:\CLIENT FOLDERS\king\King prima and pretext of prof reasons.wpd

Ms. Sams can fairly be said to have been acting as a final policy maker, or the policy and the final policymaker combined to cause the challenged deprivation. *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986). The policy makes the individual department head, or any person a department might authorize to make a termination decision, a final decision maker.

"A probationary . . . employee may be dismissed at any time, for any on no reason, and it's not entitled to the grievance and appeal provisions set forth in these policies and procedures." (King Dep. Ex. 37 p. 46, 47).

The probationary employee termination policy is a deliberate choice of the City.

As implemented or applied in this situation even though McCauley asked repeatedly for reasons for the termination, the decision of Sams was in fact the final decision and was unreviewed or unreviewable.

Defendants cannot show by undisputed facts that a reasonable jury could not find that under the policy, and as implemented in this case, Ms. Sams was not a final policymaker, nor can the Defendants show by undisputed facts that the policy did not play a causative role in the termination of the .Plaintiff.

Ms. Sams can also be liable in her individual capacity under either constitutional claim.

VIII.   Qualified Immunity

The City is not entitled to qualified immunity.  *Owen v. City of Independence, Mo.*

Qualified immunity does not apply to the race claim under title VII.

In the constitutional race claim, in 2003, would an objectively reasonable public official have been on fair notice that it was unlawful to use race as a motivating factor in an adverse employment decision?  The Thirteenth amendment was ratified 1865, and the Fourteenth amendment was ratified 1868.  The statutory prohibition against race discrimination was added

35

C:\CLIENT FOLDERS\king\King prima and pretext of prof reasons.wpd

as an overlay to constitutional restrictions prohibiting discrimination in employment through the Civil Rights Act of 1964 (Title VII). "It was clearly established in 1999 that it was unlawful for a public official to make a race- or gender-based decision concerning hiring, termination, promotion, or transfer to or from an existing position. *Williams v. Consol. City of Jacksonville*, 341 F.3d 1261, 1272 (11th Cir. 2003).

Under the First Amendment, free speech has long been protected from retaliation. *Ratliff v. DeKalb County, Ga.*, 62 F.3d 338, 340 (11th Cir. 1995).

C:\CLIENT FOLDERS\king\King prima and pretext of prof reasons.wpd

IX.    Defendants Cannot Meet Burden to Demonstrate by Undisputed Fact That They Would
Have Terminated Plaintiff Any Way, Where Some Reasons Proffered Obfuscate the Facts, and
Where Defendants Cannot Demonstrate by Undisputed, Preponderance of the Evidence That
They Would Have Terminated Plaintiff Anyway, Even If a Prohibited Motive Played a Part.

     A.    Introduction and the Correct Burden

     Defendant implies that Plaintiff, at summary judgment, has to "prove" pre-text by

preponderance, whereas the determination of a preponderance of the evidence is the result of the

jury weighing and crediting the two sets of evidence.  While Plaintiff has proffered evidence

from which a jury could infer a prohibited motive, and she has proffered evidence from which

pretext could reasonably be inferred, by inconsistencies, shifting reasons, causation questions,

and a suspicion of mendacity, to be honest, Defendants would have to admit, they have not

shown by undisputed evidence that they would have terminated Plaintiff any way by specific

objective facts that would support such a conclusion without dispute or without inferences drawn

in their favor, and it is their burden to do so, if they are to have summary judgment.

     The Defendants imply that Plaintiff has a burden, within the context of this motion for

summary judgment to demonstrate that each proffered reason itself must be able to be dispelled

by a "preponderance" of the evidence, that not only is the particular reason false, but that a

prohibited motive or disparate treatment must be shown within the circumstances of each

proffered reason, on the face of the documents without drawing inferences in Plaintiff's favor.

(Def. Brf. 19-24).  Defendants impose upon Plaintiff the burden to demonstrate that not only is

the attendance issue pre-text, but that " 'poor attendance-was a pretext for discrimination 'because

of her [race].' *Armindo* [*v Padlocker*], 209 F.3d at 1322 [(11th Cir. 2000)]."  (Brf. of Defs. at 21.

It is not enough for Defendants that a prima facie case of race discrimination or a prohibited

37

C:\CLIENT FOLDERS\king\King prima and pretext of prof reasons.wpd

retaliation for the termination can be shown, but in addition, , Defendants require that the facts to

reject each proffered reason must independently support a race or retaliation case.  This would be

direct evidence for the prima facie case and direct evidence as to each proffered reason.  The

Defendants impose a double direct evidence standard.

At summary judgment the Plaintiff cannot and does not have to "prove" anything, which

by definition requires a finder of fact – as to resolution of disputed facts, by weight or credibility.

The Plaintiff has to "proffer" evidence that will support a prima facie case by direct or

circumstantial evidence, by the inferences favorably drawn.  Plaintiff has to "proffer" or point to

evidence and reasonable inferences that could support a conclusion of pre-text.  At summary

judgment, this  Defendant, has the burden under Rule 56(c), "The judgment sought should be

rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show

that there is no genuine issue as to any material fact and that the movant is entitled to judgment

as a matter of law."

"Section 2000e-2(m) unambiguously states that a plaintiff need only "demonstrate" that

an employer used a forbidden consideration with respect to "any employment practice." *Desert*

*Palace, Inc. v. Costa*, 539 U.S. 90, 98 (2003).  "Congress explicitly defined the term

"demonstrates" in the 1991 Act, leaving little doubt that no special evidentiary showing is

required. Title VII defines the term "'demonstrates'" as to "meet the burdens of production and

persuasion." § 2000e(m). If Congress intended the term "'demonstrates'" to require that the

"burdens of production and persuasion" be met by direct evidence or some other heightened

showing, it could have made that intent clear by including language to that effect in § 2000e(m)."

C:\CLIENT FOLDERS\king\King prima and pretext of prof reasons.wpd

*Id.* at 99.

Because the defendants claimed they would have fired King anyway, they have an

evidentiary burden, even though this is summary judgment, that cannot be met by mere proffer of

illusory reasons that would not be a real reason to terminate, which is difficult to decide as a

matter of undisputed fact where intent is at issue and weight and credibility to be determined by a

jury. The charge at issue in Desert Palace reflects defendants burden:

> You have heard evidence that the defendant's treatment of the plaintiff was
> motivated by the plaintiff's sex and also by other lawful reasons. If you find that
> the plaintiff's sex was a motivating factor in the defendant's treatment of the
> plaintiff, the plaintiff is entitled to your verdict, even if you find that the
> defendant's conduct was also motivated by a lawful reason.
>
> "'However, if you find that the defendant's treatment of the plaintiff was motivated
> by both gender and lawful reasons, you must decide whether the plaintiff is
> entitled [*97] to damages. The plaintiff is entitled to damages unless the
> defendant proves by a preponderance of the evidence that the defendant would
> have treated plaintiff similarly even if the plaintiff's gender had played no role in
> the employment decision.'" Ibid.

*Desert Palace, Inc. v. Costa*, 539 U.S. 90, 97 (U.S. 2003). The petitioner unsuccessfully

objected to this instruction, claiming that respondent had failed to adduce "direct evidence." Id.

at 98. "[I]n *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (cit omitted) (2000), we

recognized that evidence that a defendant's explanation for an employment practice is "unworthy

of credence" is "one form of circumstantial evidence that is probative of intentional

discrimination." Id., at 147, 147 L Ed 2d 105, 120 S Ct 2097 (emphasis added). The reason for

treating circumstantial and direct evidence alike is both clear and deep-rooted: "Circumstantial

evidence is not only sufficient, but may also be more certain, satisfying and persuasive than

direct evidence." (cit. omitted). *Id.* at 100.

Requiring plaintiff to "show" or "prove," at summary judgment, a fact by a

"preponderance" of the evidence is error. A "preponderance" involves a determination of

C:\CLIENT FOLDERS\king\King prima and pretext of prof reasons.wpd

weighing and crediting, which is a function reserved for the jury.

Since 1994, in the Eleventh Circuit, an employee can survive the employer's motion for

summary judgment by presenting evidence that the employer's articulated reason for its decision

was false or was otherwise pretextual, without presenting any direct evidence of discrimination.

*Howard v. B.P. Oil Co.*, 32 F.3d 520, 525-26 (11th Cir. 1994).   In a Third Circuit case, *Sheridan*

*v. E.I. duPont de Nemours and Co.*, 100 F.3d 1061,1068 (3rd Cir. 1996) (en banc), the full panel

addressed the same issue as in *Howard*, where the *Sheridan* court interpreted *St. Mary's Honor's*

*Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742 (1993):

> . . . *Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1124 (7th Cir. 1994) (to
> defeat summary judgment, Title VII plaintiff "must only 'produce evidence from
> which a rational factfinder could infer that the company lied' about its proffered
> reasons for his dismissal" (citation omitted)); *Mitchell v. Data Gen. Corp.*, 12
> F.3d 1310, 1316 (4th Cir. 1993) (plaintiff can defeat summary judgment by
> "presenting evidence sufficient to establish a prima facie case, and . . . showing
> that there is a genuine dispute of material fact about [the defendant's] proffered
> explanation" for its action); *Washington v. Garrett*, 10 F.3d 1421, 1433 (9th Cir.
> 1993) ("As *St. Mary's* recognizes, the factfinder in a Title VII case is entitled to
> infer discrimination from plaintiff's proof of a prima facie case and showing of
> pretext without anything more . . . .").

*Sheridan*, 100 F.3d 1068.  The *Sheridan* court discussed *Furnco Construction Corp. v. Waters*,

438 U.S. 567, 577, 57 L. Ed. 2d 957, 98 S. Ct. 2943 (1978) and other cases, and *Sheridan* stated:

> . . .We are willing to presume this largely because we know from our experience
> that more often than not people do not act in a totally arbitrary manner, without
> any underlying reasons, especially in a business setting. Thus, when all legitimate
> reasons for rejecting an applicant have been eliminated as possible reasons for the
> employer's actions, it is more likely than not the employer, who we generally
> assume acts only with some reason, based his decision on an impermissible
> consideration such as race. Id. [*Furnco*]. . . .

> As another court recently remarked in the context of an employment
> discrimination case: "Resort to a pretextual explanation is, like flight from the
> scene of a crime, evidence indicating consciousness of guilt, which is, of course,
> evidence of illegal conduct." *Binder v. Long Island Lighting Co.*, 57 F.3d 193,
> 200 (2d Cir. 1995). . . .

> We routinely expect that a party give honest testimony in a court of law; there is
> no reason to expect less of an employer charged with unlawful discrimination. If

C:\CLIENT FOLDERS\king\King prima and pretext of prof reasons.wpd

> the employer fails to come forth with the true and credible explanation and instead keeps a hidden agenda, it does so at its own peril. Under those circumstances, there is no policy to be served by refusing to permit the jury to infer that the real motivation is the one that the plaintiff has charged.

*Sheridan*, 100 F.3d at 1069.

Given the shifting explanation of what it was that Plaintiff was allegedly talking about in the office (was it "sealed bid" information and genuinely "confidential information," was it the vague generalities of something about "a user comment" or was it the same question raised in the class that had angered Sams and breached the rule that non-Blacks should not question Sams) Defendants should not be able to claim summary judgment based on a mere proffer of "mistaken belief defense." This defense is yet to be asserted and the claim that all Defendants have to do is "proffer" a good faith belief in order to have summary judgment, is as is argued previously error. Judgment as a matter of law for Defendants should be predicated on undisputed substantive facts that could prove the ultimate proffered conclusion, as to such issues as intent.

There is no denying that when plaintiff was talking in the office, she had just come from a class and by Ms. Sam's and Plaintiff's account the subject of requisitions for gift certificates had come up in the at 10 may deny the anger, but the fact that there were discussions in the class this question was asked is not really in dispute. As a matter of causation for the termination, the communication in the class, is difficult to separate from the conversation in the office, without resolution of some ultimate issues relating to intent. Did Ms. Sams terminate plaintiff for what was said in the class or for what was said in the office? Defendants have the burden to show by undisputed fact that the termination was without prohibited motive in order to be granted summary judgment.

We know there is no evidence from any third party that Sams came into the office and stopped Plaintiff and whoever she was talking to, about the gift procedure issue. Plaintiff's version of that incident is that Ms. Sams did not come into the office and say anything. (King

41

C:\CLIENT FOLDERS\king\King prima and pretext of prof reasons.wpd

Dec. ¶ 133-141).  There was nothing to see.

We know that at the time of the termination, according to McCauley, Sams would give him no reason, in spite of some prodding.     (McCauley Dep. 24).

When Sams did her time line, obviously at some point when she knew there was an issue, she did it in a way to make it appear that Ms. King had bad intentions, either by shading the language or by omission.  (Sams Dep. Ex. 5). **(Ex. C)**.  Sams failed to mention Plaintiff had approval to take time off for her brother's wedding.  (Sams Dep. Ex. 5)  (King Dec. ¶ 35-42). Sams failed to mention that King had a doctor's excuse and that she and others had approved of her staying home, probably for their own health. (Sams Dep. Ex. 5) (King Dec. ¶ 43-56).

There is no mention of the refusal of Ms. King to sign off on the transcript that Sams changed. (Sams Dep. Ex. 5) (King Dec. ¶ 57-72).

Sams characterizes the power cord incident, at which she said nothing at the time, as if King and Martiza had been deliberately indifferent about safety over a period of two days, where Charles Brooks has the incident in one day, and reflects no deliberate indifference to safety, and his version comports with King's version. (Sams Dep. Ex. 5) (King Dec. ¶ 85-101) (Brooks Aff. ¶ 4 & 5). Sams mentions the suggestion by King that they would move the furniture, but there is no mention of the word insubordination, even though that is an offense that can get a permanent employee terminated.  The time line is written up as if it is a safety refusal issue, and now the focus is insubordination, based on the comment.

The capris pants issue is written up without explanation that the "casually dressed" Ms. King was wearing capri pants, which are not prohibited by the Dress Code. (Sams Dep. Ex. 5).  It is written up without the explanation that Ms. King was not informed of Ms. Sams' no capri pants rule until that day.  It is clearly drafted to give the impression that Ms. King wore jeans that day, which is a violation of the Dress Code.  (Id.).  Ms. King's version shows she was following

C:\CLIENT FOLDERS\king\King prima and pretext of prof reasons.wpd

dress code and was first told of the capri pants rule that day and that Ms. Sams had no problem with that day, and obviously King never wore capri pants again. (King Dec. ¶ 102-116). In deposition when Sams saw the capri pants, she denied they were the same pants. (Sams Dep. 78)

The IFAS training entry of Ex. 5 does not reference the question Plaintiff asked in the training. It makes it appear that everything that was to be said in that meeting was confidential. Holmes testified that she never recalled Ms. Sams saying in an IFAS meeting that what is discussed there stays there. (Holmes Dep. 12). Plaintiff says there was no order that every bit of information from the meeting was confidential. (King Aff. ¶ 132-117).

In Sams version of the events in Ex 5, when construed chronologically, it is that she warned Brooks and King in the meeting everything had stay in the meeting, and that after the meeting she saw/heard King discussing "sensitive information." King says after the class she only discussed the question about the procedure of who has jurisdiction, payroll or purchasing. (King Aff. ¶ 133-141). In Ex. 5 and Kings version, there is no indication that Sams confronted King after the class.

In deposition Ms. Sams says that King repeated "all of the things that were discussed in the conference room." (Kind Dep. 84). She says King stood in the middle of the room and repeated the sensitive information. (Id.). Ms. Sams acknowledged that the Accounting Department has regulations about gift certificates. (Id. at 86). Sams denies being confronted by Ms. King about the conflict between her verbal instructions and the regulations as read by Ms. King. (Id. at 87).

The issues are further factually in dispute because even if the jury were to determine that Plaintiff was terminated for what she said in the office, the facts can show, if inferences are drawn in Plaintiff's favor, that in the office Plaintiff was asking questions about the process, which in effect, by Sams' racial sensitivities, was an affront that was based on race.

43

C:\CLIENT FOLDERS\king\King prima and pretext of prof reasons.wpd

"An employer's changing rationale for making an adverse employment decision can be evidence of pretext." *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1167 (6th Cir. 1996).

A plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000).

A plaintiff may seek to prove that [*23] an articulated reason is pretextual by pointing out "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action." *Cooper v. Southern Co.*, 390 F.3d 695, 725 (11th Cir. 2004).

B.  Addressing the Proffered Reasons

1.    Shifting Reasons and Racial Motive to Call Plaintiff's Statement Agreeing to Move the Furniture Insubordination.

It is material that Sam's ignores the true reasons for the termination, which include the questions asked in the classroom and the same topic being discussed in the office, and Sam's refusal to sign off on the transcript.

There is no evidence that Plaintiff did not perform her job.  There is no evidence of any counseling during the time of her employment.  There is no evidence that the employer gave Ms. King a warning about some behavior and then she violated it again.

As to all proffered reasons, because no verbal warnings were given and no reason given in spite of the prodding by McCauley (McCauley Dep. 24) all proffers involve shifting reasons to a greater of lesser degree.

The Defendants' policy of being allowed to terminate a probationary employee for any

C:\CLIENT FOLDERS\king\King prima and pretext of prof reasons.wpd

reason without having to give a reason can be an abuse of governmental power in so many ways, and it makes it hard for anyone to believe any reason proffered, where the incident is not temporally closely connected to the termination as a matter of causation, which is a jury question. A reasonable jury would look at this situation and seriously question, that even if there was a policy, then why would  someone in government who had a legitimate reason, not offer it at the time of termination, unless something else was afoot.

Shifting reasons are unworthy of credence, and an example is found in *Siraj v. Hermitage in N. Va.*, 51 Fed. Appx. 102, 111 (4th Cir. 2002), where the belated proffered reason was that the employee had sabotaged files to undermine a performance inspection:

> Fourth, the fact that VUMH shifted its stated reason for discharging Siraj over time is further proof that VUMH's proffered reason for Siraj's discharge is unworthy of credence. *EEOC v. Sears*, 243 F.3d 846, 852-53 (4th Cir. 2001) HN10(employer's shifting reasons for adverse employment action is, in and of itself, probative of pretext). When Siraj asked Henderson at the time of her discharge to tell her the reason why he decided to discharge her, Henderson only told Siraj that it was because "[the Social Service inspectors] found the maintenance files weren't complete." (J.A. 156). Not a single word was uttered to the effect that Siraj deliberately selected incomplete files from the Maintenance Department in an effort to sabotage VUMH's performance in the inspection.

In our case the lack of credence is apparent because of shifting reasons.  The moving of the office furniture and the comment at issue occurred in October and Plaintiff was not even counseled at the time.  After the termination, is the first time it is brought up as possible insubordination.  That this incident is used as insubordination reflects Sams' racially twisted sensitivities.

a.      Response to Question about Moving Furniture in October - Plaintiff Terminated in November.

At the time of the incident of the alleged insubordination relating to moving furniture or the cord in October,  Def. Sams said nothing. (King Dec. ¶ 85-101).  King responded in a

C:\CLIENT FOLDERS\king\King prima and pretext of prof reasons.wpd

straight forward manner and was not sarcastic. (Id. ¶ 98-99). King even talked to Ms. Sams in

her office and nothing was said about I did not like your tone, or a similar allegation. (Id. ¶ 100-

101).

At the time of the termination Ms. Sams said nothing about the alleged insubordination,

and if there were two instances of alleged insubordination, it is implausible that something would

not have been said at the time, especially where King's actions were open and in the office of in

the classroom that were more or less public. All Ms. Sams said at the termination was that she

was letting Ms. King go, (McCauley Dep. 24)(King Dec. ¶ 142-47) even though King asked a

couple of times as to why, the only answer given was just that she was letting her go.

The other evidence, as to reasons or versions of why Plaintiff was being let go, ought not

be derived from the put together arguments and manipulations of the evidence, except to the

extent that changing reasons and inconsistencies in facts and versions of facts, reflect more

shifting reasons undermining credence. Defendants claim they wold have fired Plaintiff any way,

by asserting, "Plaintiff was insubordinate towards Ms. Sams regarding the placement of office

furniture." (Def. SJ Brf. 22).

In a document created by Ms. Sams for her prior attorney, Mr. Frails, she says that the

issue was not one of insubordination, but it was a safety issue and that they had ignored Mr.

Brooks.. (Sams Dep. 60-61, Ex. 5). In the entry for October 30, Ms. Sams does not even use the

word insubordination. (Id. Ex. 5). She mentions nothing about tone that might imply

insubordination.

She writes it as if the move occurred on one day, Brooks told them about the power cord,

they refused to move it, and she came in the next day and saw it, had them get Brooks, and

Brooks told her that he had told them to move it the day before it was a safety violation and they

ignored his advice. (Id. Ex. 5). Mr. Brooks describes the incident as occurring in one day and

46

C:\CLIENT FOLDERS\king\King prima and pretext of prof reasons.wpd

that he did not inform Ms. Sams that he told them to move the furniture because of the power cord and they refused. ( Brooks Dec. ¶ 4 & 5). Brooks said he saw the power cord where it was, suggested to "Ms. King and other employees" that it might be a safety violation. (Id.). He left, and when he returned he saw Ms. Sam's asking everyone in a conversational manner why the cord was situated as it was. (Id.). King says Brooks helped them move the furniture. (King Dec. ¶ 90-91).

In deposition Ms. Sams was asked why she terminated Plaintiff, and she said due to Ms. King's disposition or the way she spoke to me one morning when they were changing furniture . . . ." (Sams Dep. 60). At deposition Ms. Sams said that Ms. King was "insubordinate" and "hostile" when she spoke to her. (Sams Dep. 70). Viewing someone who is acting within her rights as" hostile" can be direct evidence of discrimination. *Drebing v. Provo Group, Inc.*, 2007 U.S. Dist. LEXIS 75637, 61-62 (D. Ill. 2007)

Ms. Sams admitted that insubordination was an offense for which one could be immediately terminated, (Id. 70-71) however she took no action at the time, and did not even have a verbal conference with Ms. King. There were other people present to back Ms. Sams if in fact Ms. King had been sarcastic or insubordinate. King went to see Sams in the privacy of her office, where one might expect a sensitive but legitimate manager to raise the issue, but Ms. Sams said nothing. The power cord incident occurred in October, and Sams never brought up insubordination about the power cord incident, and King was terminated November 12, for conversation, both during the meeting that was more public than in-house and after, related to the IFAS class about procedures of payments of public funds, where the precise content of the speech that caused Sams to terminate King is in dispute, where if the facts are resolved in King's favor as to content, then there is direct evidence that the questioning speech about possible official corruption has both racial components, as Whites or non-Blacks, could not question

47

C:\CLIENT FOLDERS\king\King prima and pretext of prof reasons.wpd

Sams, and protected speech concerns as training or academic speech or speech directly

questioning the legitimacy of the actions of a public official; or is speech asserted in the training

fora provided for such speech, and termination for such speech in that fora is unduly harsh and an

overly broad regulation of speech in an arbitrary manner, in denial of equal protection.

In *Sylvester v. SOS Children's Vills Ill., Inc.*, 453 F.3d 900, 905 (7th Cir. 2006) the court

addressed pre-text including a labeling by the employer of some speech as insubordination.

> But there was the following circumstantial evidence. First, the prompt
> firing of two of the four signatories; it is undisputed that they were poor
> performers, but, if so, why were they not fired until shortly after they signed the
> letter accusing West of sexual harassment, an accusation that could get the
> company into trouble? Second, as there were no current performance issues with
> Sylvester, why was her performance brought up at the meeting at which the
> chairman of the board and the lawyer member, Roth, decided to fire Elstad and
> Ryan? And third, why was West authorized at that meeting to fire her not for
> performing her job badly but for reacting adversely to news of the firing of two of
> the cosignatories of the letter? A reasonable jury might conclude that she was
> being set up--that the defendant's officers who met the night before knew she was
> sure to be upset by the firings, and that West was being invited to interpret that
> predictable reaction as insubordination. Putting together these items of
> circumstantial evidence, a reasonable jury could conclude that the accusations of
> sexual harassment in the letter signed by Sylvester were a cause of her being fired.
> No more is necessary to show that she established a prima facie case using the
> "direct" method of proof.

A jury could find that even though Sams interpreted, or has now declared, that the

comment was insubordinate, that this is a subjective determination, which is suspect.  This

conclusion of Sams is born of fear or disdain as to a competent, White subordinate who asked a

legitimate question in places and at times that are appropriate in the context of training..  A jury

could conclude something about the comment sparked a feeling in Sams that made her remember

the incident, and that feeling is that King was not being helpful, she was disrespecting Sams

because of race, and Sams would have none of that. If there had been genuine insubordination,

because this speech was in the presence of others in the office, a legitimately acting manager

would have addressed at the time, then or in her office in private. Sams cannot call King

C:\CLIENT FOLDERS\king\King prima and pretext of prof reasons.wpd

insubordinate, when there is a question of fact about whether it was Sams who infused race into

the mix, to blame King for her own sensitivities connected to control of power and race.

A reasonable jury could find first, that the claim that King was insubordinate in a

statement to Ms. Sams about moving the furniture is false. The offense calls for immediate

termination, it was not done at the time, and in fact did not even draw any negative discipline

from Sams in spite of opportunity. A reasonable jury could find that race was a motivating factor

as to why Sams considered King's comments to be insubordinate at the time, and it was not

addressed at the time for that reason.

                            b.       Race Played a Factor in Sams Labeling King's Comments as
Insubordinate.

Ms. Rodriguez's affidavit supports the conclusion that in general Ms. Sam's gave

preferential treatment to the African-Americans. Ms.. Rodriguez affidavits states that she "was

more fair to African-American men and women." (Rodriguez Aff. ¶ 7 ). The converse inference

would be true, that Whites were treated more harshly.

Ms. Rodriguez's affidavit supports the conclusion that the degree of harshness of Ms.

Sam's reaction to someone who questioned her had an unlawful racial component, in keeping

with the general preferential treatment of African-Americans. In paragraph 4, Ms. Rodriguez

states that "we," which a reasonable jury would conclude to reference those who were not Black,

and states, "However, we were not allowed to question Ms. Sam's authority the way Doreen

Holmes, Deborah Williams, and Phyllis Mills were allowed to do." (Rodriguez Aff. ¶ 4).

Doreen Holmes, Deborah Williams, and Phyllis Mills are African-American. (King Dec. ¶ 10,

13, 14).

If this business place were being run legitimately, and free from racial tension, and if Ms.

Sams had real doubts about an insubordinate tone, she could have asked Ms. King directly about

C:\CLIENT FOLDERS\king\King prima and pretext of prof reasons.wpd

it, accused Ms. King then, or in private, to question her about her tone.  A jury could find that because race played a factor, Ms. Sams could not address the issue legitimately, and that  The manner she chose, was because race played a part.

In *Garcetti v. Ceballos*, 126 S.Ct. 1951 (2006), the senior prosecutor questioned the junior prosecutor about the tone of his memo and of his accusations in the meetings with the Police Department.  In a workplace that is free from race, subjective matters can be openly discussed.  In a workplace shrouded in race-based mis-perceptions of other's actions by management, that which is a mere question or reply is deemed "insubordinate," and swept under the rug of a policy that allows termination for any reason, including prohibited reasons of probationary trainees.

There was a time when "uppity" was used as a "lawful" basis for termination, but with equal treatment under the law, supervisors Black and White, rely on "insubordination."

That this event would have been a real reason that Ms. Sams would have terminated Ms. King  is belied by the fact that if Ms. King had been insubordinate in any palpable or provable degree, then someone else present would have been summonsed by Ms. Sams to back her up. This is just one more straw for which Ms. Sams is grasping.

Agreeing to move power cord when asked would not be perceived as being insubordinate by anyone not motivated by race, where there is no clear evidence of sarcastic tone.  There were ample witnesses present.  Mr. Brooks came by and he could offer no aid on the material question about tone that might reach to insubordination, the impetus of which is not in the mind of the receiver.

This event was used to bolster the ultimate pretextual proffered reason, that Ms. King disobeyed an order (where another event in the class and the other event after the class really were motivating Ms. Sams) so that Defendants can make it look like the comments the day

C:\CLIENT FOLDERS\king\King prima and pretext of prof reasons.wpd

before the termination were a second strike of insubordination.

A plaintiff may seek to prove that an articulated reason is pretextual by pointing out "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action." *Cooper v. Southern Co.*, 390 F.3d 695, 725 (11th Cir. 2004).    Ms. Sam's and the Defendants offer no testimony from objective witnesses that Ms. King had a sarcastic tone or manner in her response about the power cord.  Person's not motivated by race would perceive Ms. King as being helpful and responsive.  Ms. King's version of the events is more likely. Where the facts are false, the reason proffered is pretext. Where the event is perceived as de minimus, the jury may reject it as pretext.

       2.    The Questioning of Sams' Authority, Seen as Race Related by Sams, is the True Reason for the Termination and Not Ms. Sams' Version of the Events of What Happened After the IFAS Class.

It is material that Sam's ignores the true reasons for the termination, which include the questions asked in the classroom and the same topic being discussed in the office, and Sam's refusal to sign off on the transcript.

Plaintiff as incorporates: III -V and p.18-23 & 14-16.

Plaintiff incorporates the evidence on race and retaliation in the prima fascia case which has direct and circumstantial evidence of race discrimination retaliation, that  For racial reasons, Sam's disdains Whites who questioned her, that the environment is generally more difficult for Whites or that Ms. Sam's treats Whites more harshly than Blacks.  The direct evidence shows that Plaintiff was terminated one day after she questioned Ms. Sam's in a class, in front of persons from other departments, or after she discussed questioned Sam's to and with someone in the office after the class.

If after the meeting plaintiff was engaged in revealing confidential information, then why

C:\CLIENT FOLDERS\king\King prima and pretext of prof reasons.wpd

at that time, did Ms. Sams, who asserts authority and therefore duty to control such confidential or sensitive information, not step into the office and stop Plaintiff from telling everything that she heard in the meeting in the middle of the office floor?  Sam's explanation is implausible. Plaintiff's version of the events, that she was talking about the question she had asked Sams in a meeting with regard to the conflict between Sams' verbal instructions and the written materials, or regulations apparently from the Accounting Department. Sams did not intervene in the office because Plaintiff's version of the events shows that if she had intervened, it would have exposed the underlying question, which would have exposed her disdain for Whites who questioned her.

As a matter of causation, which is a jury question, first, because Sam's is disingenuous, if the classroom speech and the public embarrassment by the new White girl is found to be the reason for the termination, what happened afterwards in the office falls away as false pretext.  A reasonable jury could conclude that during the class but after the question by King, Sam's had already formed the intent to terminate the Plaintiff, and Sams used a slightly twisted version of what Plaintiff was talking about in the office, to mask the earlier discriminatory and retaliatory decision.

If Plaintiff was violating a rule, when she was talking to someone in the office, whoever Plaintiff was talking to was also violating that rule.  It is undisputed that nothing was done at the time and nothing was done to the other person to whom plaintiff was talking.  It is implausible under the evidence that King was doing anything in the office other than asking about the process and explaining her dilemma, between written regulations and verbal instruction.  Not even Sam's would try to write up another individual for discussing the question between written regulations and verbal instructions. If King was talking to a Black employee, and now King was terminated as a result, because genuine confidential information was being discussed, why was the Black employee not disciplined?  Either way Defendants liable.

C:\CLIENT FOLDERS\king\King prima and pretext of prof reasons.wpd

In our case Defendants relying on a vague and shifting definition of "confidential information," ",insubordination," "nothing in this room leaves this room," to "a comment about a user department," as justification to say plaintiff would have been terminated for speech in the office.  The disputed facts and evidence reflect that Defendants have not met their burden show by undisputed fact, that they would have terminated plaintiff any way, especially when they conflate one of the incidents upon which plaintiff relies to show that she was terminated unlawfully.

In *Cornett v. Navistar Inc.*, 2001 U.S. Dist. LEXIS 8067, 17-18 (D. Ind. 2001) there was an unclear definition of "insubordination," and the District Court denied summary judgment because the employer had no clear definition of what rule was allegedly violated.

> In Gordon, United Airlines terminated the plaintiff, a probationary flight attendant, for "unauthorized deviation" when he deviated from his work schedule without authorization. In concluding that there was a question of fact as to whether United's reason for terminating Mr. Gordon was pretextual, the Seventh Circuit noted that the company did not have a clear definition of what constituted an "unauthorized deviation." Id. at 890. But there were several other facts the Court relied upon in its analysis, including the following: (1) the individuals involved in the plaintiff's termination offered different definitions of the term "unauthorized deviation;" (2) one supervisor relied upon another's definition of "unauthorized deviation" as a justification for firing the plaintiff even though she did not believe that his definition or the facts he alleged constituted an "unauthorized [*21] deviation;" and (3) United rarely invoked the "unauthorized deviation" infraction, and although other employees engaged in similar conduct, United deemed their conduct to have been a "missed flight," which warranted only an interim warning. Id.

In our case the determination of whether to call plaintiff "insubordinate" or to say that had violated a rule laid down in the class, rests in the subjective intent of an interested party whose credibility is at issue.

There is evidence from Rodriguez at Sams objects to non-whites questioning her and that Ms. Sams treats Blacks more fairly than Whites, which by any other name is disparate treatment.

In *McNack v. Warren*, 2000 U.S. Dist. LEXIS 14381 (D. Or. 2000) the court addressed a

C:\CLIENT FOLDERS\king\King prima and pretext of prof reasons.wpd

situation in which women were labeled as insubordinate for asserting their rights and it was

suggested that was direct evidence.

> The weekly comments by Warren concerning McNack's race are direct evidence
> that he was preoccupied by her race and the effect of her race on her co-workers.
> McNack and two co-workers have provided evidence that Warren unduly
> criticizes women and routinely accuses them of insubordination. Along with the
> inferences to which McNack is entitled in a summary judgment analysis, I
> conclude that she has raised a genuine issue of material fact on whether the stated
> reasons for her termination were a pretext.

      3.     The Capri Pants Do Not Violate the Dress Code, and Sams Invented and
Discriminatorily Applied Her Capri Pants Rule Ex Post Facto, After Acting Legitimately at the
Time by  Not Finding Fault, And Other Shifting and Pre-textual Reasons that Discredit Ms.
Sams.

It is material that Sam's ignores the true reasons for the termination, which include the

questions asked in the classroom and the same topic being discussed in the office, and Sam's

refusal to sign off on the transcript.

Plaintiff incorporates the sections on prima facie case on race and retaliation for protected

speech.

At some point, the line of substantive due process and equal protection is crossed, when

Ms. Sams' shifting and changing reasons are used to obstruct the judicial process, but at this point

it is just a credibility issue, reserved for the jury.

The Defs. claim that Plaintiff violated the "Purchasing Department dress code" because

Ms. King wore capri pants to work, to create the impression that Ms. Sams' unwritten rules trump

the official dress code and orientation about the dress code, and that due process is Sams' due

process.  (Def. SJ Brf. 23). The evidence shows the capri pants proffer is not credible for its

"weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's

proffered legitimate reasons for its action."  *Cooper v. Southern Co.*, 390 F.3d 695, 725 (11th

Cir. 2004).  The evidence shows that such a position is inconsistent with the position taken by

C:\CLIENT FOLDERS\king\King prima and pretext of prof reasons.wpd

Sams at the time when Plaintiff wore the capri pants, and a jury would find that only a superior acing with malevolent motive would now claim this as a reason to fire an employee, and that other facts must be behind the true reason for the termination. It also exposes Ms. Sams' willingness to lie in order to get the result she wants, reflecting clear credibility issues that permeate material assertions by Ms. Sams.

First, the capri pants assertion is a shifting reason temporally. Causation is a jury question, and where there is evidence of intervening events between the proffered reason and the challenged adverse action, the proffered reason is not indisputably a reason that would have cause the employee to have been terminated, because at the time the employee was not terminated. The "capri pants incident" occurred on about November 4. (Sams Dep. Ex. 5, Bates 56). The termination occurred on November 12. A reasonable jury could find that temporally, there is substantial doubt about whether this alleged incident would have caused Plaintiff to be terminated any way. This will be further clear when the facts of the incident are addressed from the evidence according to Plaintiff, and will explain why Ms. Sams would have been risking her own neck to have taken adverse action against the Plaintiff at the time.

The facts show that Ms. King was following the dress code and the orientation she had received when she wore the capri pants to work one day, and was warned by other employees about Ms. Sam's rule before Ms. Sams came to work. When Ms. Sams came to work, King apologized and then met with Ms. King. Ms. King apologized some more and said that she would go home an change, but Ms. Sams, said no, and just told Ms. King not to do it again. (King Dec. ¶ 5 & 6, 102-116).      When Ms.King was meeting with Ms. Sams about the capri pants, Ms. King did not know where this rule was coming from, and it did not matter to Ms. King, because Ms. King was "new, she's my boss, I do what I'm told. If she tells me she doesn't want me to wear capris in the office, I don't' wear capris in the office . . . ." (King Dep. 47).

C:\CLIENT FOLDERS\king\King prima and pretext of prof reasons.wpd

The policy states, "Dresses, skirts, skorts, shall be no more than 3 inches in length above the knee." (Ex. D, Def. Exhibits SJ mot.). There is no evidence in the record that Ms. King's capri pants were even at, or above the knee. There is no evidence that they were of denim or appeared to be jeans. (King Dec. ¶ 103 & 110).

At summary judgment Defs. are asserting the wearing of the "capri" pants violated dress code. Substantively the allegations are inconsistent in a "material" way, so to speak. Today the allegation is that Plaintiff was wearing "capri" pants, with the obfuscated implication that they violated dress code.

When Ms. Sams created Exhibit 5, attached to her deposition, in which she was trying to justify her actions consistent with the County Dress Code, the statement was written to create the impression that on November 3 or 4, Ms. King was wearing "jeans." (See Bate 57 of Ex. 5). The County Dress Code prohibits "jeans." (Defs. Ex. D, filed in SJ mot.). Such a claim by Ms. Sams makes a good case against King under the County Dress Code, and it also prohibits internal discovery of the fact that Ms. Sams is establishing rules about dress in deviation from accepted county practice. "[A]n employer's deviation from its own standard procedures may serve as evidence of pretext." *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1299 (11th Cir.2006)." *Smith v. City of Mobile*, 2007 U.S. Dist. LEXIS 65755 (D. Ala. 2007).

The quotations were around the "Purchasing Department dress code," because this is the first time a "Purchasing Department dress code" has been mentioned, probably because Def. Sams has been cornered in several other ways as to the real Dress Code, so now the target shifts from the "County Dress Code" provisions as found in Exhibit D of Defendant's Exhibits, to a dress code created on paper by attorneys to make it look more official by sticking the department name in front of dress code, as if it were a legitimate dress code.

Plaintiff anticipated from discovery that the capri pants allegation would come up.

56

C:\CLIENT FOLDERS\king\King prima and pretext of prof reasons.wpd

Plaintiff wore the capri pants to her deposition (King Dep. 45) and the deposition of Ms. Sams.

Ms. Sams claimed that the capri pants the Plaintiff wore to the depositions were "not the ones tat

she has on today." (Sams Dep. 128). More notably Ms. Sams said that she did not have these on

the day "she was in violation of the code." (*Id.*). The actual code does not prohibit capri pants.

(Defs. Ex. D, filed in SJ mot.). The capric pants Plaintiff wore were not too short under the

Code. (King Dec. ¶ 103 & 104).

   A reasonable jury could conclude that a legitimate employer would not have fired

Sams anyway because of the capri pants incident, and that this incident, where at the time

Plaintiff was acting consistently with the formal Code, would not have been a basis for Sams to

have terminated Plaintiff. Further, Ms. Sams' inconsistences and how they were manipulated

suggest mendacity.

   4. At the Time of the Absences, King Had Permission to Go to Her Brother's
Wedding from Sam's Through Ms. Holmes, and Had a Doctors Note for Her Illness, and Was
Told to Stay Home by Sams.

  It is material that Sam's ignores the true reasons for the termination, which include the

questions asked in the classroom and the same topic being discussed in the office, and Sam's

refusal to sign off on the transcript.

  Plaintiff incorporates the plaintiff ashy cases under the race and First Amendment

retaliation claims.

  Plaintiff incorporates the following sections: III and IV

  Ms. Sams' treatment of the absences is inconsistent, incoherent, and contradictory. "

*Cooper v. Southern Co.*, 390 F.3d 695, 725 (11th Cir. 2004). inconsistent and incoherent.

  Sams, through Holmes, approved King's absence for her brother's wedding. The absence

was never mentioned at any other time during her employment, and no legitimately acting

C:\CLIENT FOLDERS\king\King prima and pretext of prof reasons.wpd

manager would have fired King in mid-November for an approved absence that had been occurred in early October.

The Defendants cannot show as an undisputed fact, that they would have terminated Plaintiff for the absence for her brother's wedding, because causation is sorely disputed.

The evidence shows that King's absence for her brother's wedding, early in her tenure, were approved by management, including Ms. Sams, and no one ever made any complaints about the approved absence. The approved absence in early October for her brother's wedding was not a reason for which Ms. King would have been fired in mid-November by a manager with legitimate intentions, given the intervening events and circumstances.

Before she was hired, Ms. King was interviewed, and then Doreen Holmes called to offer her the job. (Id. ¶ 35). Ms. King asked Ms. Holmes for permission to go to her brother's wedding, which meant missing work October 2, 3, and 6, and Ms. Holmes said she would have to ask Ms. Sams. (Id. ¶ 36-38). Ms. King was given management permission. (Id.).

On October 2, 3, and 6, Ms.King attended her brother's wedding. (Id. ¶ 36-38). Ms. King was not paid for the days absent, (Id. ¶ 39) and the approved absence had nothing to do with accrued leave.

When she returned, neither Ms. Sams, nor any supervisor, ever discussed anything about this approved absences, including at the time of termination. (Id. ¶ 40-42). No legitimately acting manager would have terminated King for an absence the manager approved, but a manager acting with unlawful motive might use the absence as a pre-text to cover an unlawfully motivated termination, based on subsequent events that caused the unlawfully motivated manager to take adverse employment action.

Absence due to doctor verified illness, requiring doctor ordered absence that brought on no negative management comments from Sams at the time, would not be basis upon which

C:\CLIENT FOLDERS\king\King prima and pretext of prof reasons.wpd

legitimately motivated manager would terminate employee.

During the week of October 6, Plaintiff started getting sick, Thelma heard her coughing and told her to go home, and by week's end Plaintiff had a bad fever.  (Id. ¶ 43-45).   Plaintiff was confined to bed all weekend and called in sick Monday morning.  (Id. ¶ 46-48).  Plaintiff was told by Doreen Holmes and Ms. Sams to stay at home so she would not get anyone else sick, and Ms. Sams told her to get better.  (Id. ¶ 49).

Ms. King missed four or five days of work and when she returned she brought a doctors note about bronchitis and the need to stay home, which she may have showed to someone.  (Id. ¶ 51).  At no time during the remainder of her employment did Ms. Sams or any supervisor discuss anything about the absence during mid-October due to physician diagnosed bronchitis and physician backed absence,  including at the time of termination.  (Id. ¶ 52, 54-56).

No legitimately acting manager would have terminated King in mid-November for a physician diagnosed bronchitis, and physician backed absence in mid-October, but a manager acting with unlawful motive might use the absence as a pre-text to cover an unlawfully motivated termination, based on subsequent events that caused the unlawfully motivated manager to take adverse employment action.

Any arguments about accrued sick leave or vacation leave are irrelevant.  No reasonable jury would give any credit to whether Plaintiff had accrued, or had not accrued sick leave or vacation with respect to an approved absence where the employee was not paid for the days absent.

Any citation to law, for the principle that one may be terminated for absences, only begs the question as to whether under these circumstances Defendants would have terminated Plaintiff for her

C:\CLIENT FOLDERS\king\King prima and pretext of prof reasons.wpd

absences, where the evidence showed they approved her absences.

      Submitted this 12th day of December, 2007.


                              John P. Batson

                              John P. Batson

                              Ga. Bar No. 042150

                              Attorney for Plaintiff


Prepared by:

John P. Batson

303 Tenth Street

P.O. Box 3248

Augusta, GA  30914-3248


706-737-4040

Ex. A -1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
### AUGUSTA DIVISION

AMY KING,                                          )
                                                   )
          Plaintiff,                               )
                                                   )
     v.                                            )          CIVIL ACTION NO. CV 106-148
                                                   )
CITY OF AUGUSTA, GEORGIA,                          )          DECLARATION OF
its Mayor, Deke Copenhaver, individually           )          AMY KING
and his official capacity, and its                 )
Commissioners, in their official capacities, and   )
                                                   )
GERI SAMS, individually and in                     )
her official capacity as the Director of           )
Purchasing for the City of Augusta, Georgia,       )
                                                   )
          Defendants.                              )
_____ )

## DECLARATION OF AMY KING

Personally appeared the undersigned who with knowledge of the penalties for perjury states that

the following facts are true of my own personal knowledge:

1.     My name is Amy King, I am an adult competent to make this declaration.

2.     My race is White or Caucasian, and I make this statement of my own personal knowledge.

### Employment Dates and Orientation with the Handbook

3.     I was an employee in the Purchasing Department for the consolidated government of Augusta,

Georgia from about September 23, 2003 until November 12, 2003.

4.     I did not go to formal orientation for my employer until about September 29, 2003.

5.     At the orientation training I was given materials that included a copy of the dress code.

1

Ex A

6.      The verbal instructions were consistent with the written materials.

        Personnel and Race of Personnel in the Department Under Sams' Direction

7.      The highest ranking person in the Purchasing Department is Geri Sams, the Director of Purchasing.

8.      Ms. Sams is African American.

9.      I was the only White person in the department.

10.     My immediate supervisor, who was next in line to Ms. Sams, was Doreen Holmes, who is Black

11.     I don't know who was or was not Tech II.

12.     Thelma Brooks was Purchasing Tech, and I don't know if she was I or II, is Black.

13.     Deborah Williams was a Purchasing Tech, is Black.

14.     Phyllis Mills, a  Purchasing Tech is Black

15.     Maritza Rodriguez, was the Secretary / Receptionist, is Hispanic.

16.     Joane Peredo, worked on quality assurance of goods and services the city bought, and she played

a major role in the sealed bidding process, is from the Pacific Islands, her skin color is light brown, and she

is not Black by race or color.

17.     Any work product of the Department that was for display to other departments, the Commission

or the public, such as bookkeeping, accounting and documents, was done by Joane Peredo.

        What the Department Did, and Job Duties and Confidential Information

18.     The Purchasing Department receives requisitions from the other departments to purchase goods

or services to be used by the other departments, checks the amounts and the items requested to see if it

is appropriate, keeps records about the spending for the good and services purchased by the City, and

ultimately Ms. Sams approves or disapproves requests, and that for more large dollar requests, higher

2

Ex A

ranking personnel or elected officials have to sign off on such requests.

19.    The Purchasing Department deals with vendors whose goods or services may not be meeting the contract requirements or the needs of the user department.

20.    The Purchasing Department conducts the sealed bidding process.

21.    My position was titled Purchasing Technician and I don't even know if I was a I "Tech I" or "Tech II," but I did not do any substantive tasks with the sealed bidding process.

22.    What I actually did was to approve purchasing requests up to a certain dollar amount, from requests from departments that were submitted by paperwork or by computer, and then I forwarded them to superiors for ultimate approval.

23.    I did not see vendor bids as part of the sealed bid process.

24.    I did not have any direct responsibility for the sealed bids or that process.

25.    I usually finished my requests early and then asked to help others.

26.    They would have me do things like filing or taking documents to other departments.

27.    I organized the storage room, I made boxes or whatever I could do.

28.    Ms. Mills told me that maybe I should not do my work so fast, because I would run out of things to do.

29.    Joanne and Maritza were busy all of the time, with tasks that were not busy work..

30.    Thelma and Phyllis used to surf the internet a fair amount of time.

31.    In about late October, I asked Phyllis if we were allowed to do that, and she said, "Are we allowed to do what?," while she looked at the internet, and then she showed me how to download Christmas music.

32.    Having previously worked in law enforcement and the military I understood the nature of

3

Ex A

confidential information.

33.     I understood that the sealed bids and the information they contained from the various vendors was confidential information, and that such information should not be revealed.

34.     During my time in the department I was not exposed to any confidential information about a bid.

### Approved Absences for Brother's Wedding

35.     I had an interview and then Doreen called and told me that they were offering me the job.

36.     I explained that my brother's weeding was soon and asked permission to go, and she said she would have to check with Ms. Sams.

37.     If they had said no, I would not have gone.

38.     Based on the permission from Sams, through Doreen, I went to the wedding and missed work on October 2, 3, and 6, 2003.

39.     I did not get paid for the days I missed.

40.     When I returned to work, no supervisor discussed anything about absences with me.

41.     During the remainder of my employment with Augusta, no one, whether Ms. Sams, Ms. Holmes nor anyone, mentioned anything about it being a problem that I had gone to my brother's wedding, that there was a problem with my absences, or that absences were a factor in my termination.

42.     In my meeting with Ms. Sams, on November 12, when she told me I was terminated she did not bring up anything about absences.

### Absence Due to Bronchitis

43.     The week that I returned from my brother's wedding I started getting sick.

44.     Thelma noticed me coughing and told me to go home.

Ex A

45.    Near the end of the week I had a bad fever.

46.    I stayed in bed. all weekend

47.    On Monday, October 13, I went to the Dr. Wallentine, and he gave me a prescription for antibiotics and note for my absence.

48.    I called in sick on Monday morning.

49.    I was told by Doreen and Ms. Sams, not to come to work and she said that one of the reasons why was that she did not want me to get anybody else sick, Sams said you get better and I apologized.

50.    I missed a week of work, from at least October 13-16, 2003, because I had bronchitis.

51.    When I came back to work I brought a doctors note and may have shown it to someone, but there was never any problem with this absence for bronchitis.

52.    When I returned no one said anything about my absence.

53.    I said I was glad to be back at work and put me to work.

54.    I did not get paid for the days I missed, because I did not have any sick time accrued.

55.    During the remainder of my employment with Augusta, no one ever discussed that I had missed too much work due to illness.

56.    In my meeting with Ms. Sams on November 12, when she told me she was letting me go, as if they just did not need me, and as if I had not done anything wrong, she did not bring up anything about absences.

Typing of the Transcript, and Refusal to Sign off on Changed Transcript

57.    In the about the third or fourth week of October, Ms. Sams came to me early in the week, and said that  she had something that she was wanted me to do.

58.    Near the end of the week, she asked me to type a transcript.

5

Ex A

59.     At first I was hand writing it, and then I asked for a transcription machine, and they gave me a tape recorder with the foot pedal and headphones, which I used the rest of the day.

60.     The meeting was about whether the money for a construction project was Home Funds or Community Development Block Grant Funds and whether the city had properly arranged for the use of the money one way or another.

61.     Commissioner Beard and Mays, Jim Wall, Stella, Ms. Sams and others were in a conference and conference call about the money and the construction project and the bid procedure.

62.     After I finished my work on Friday, I typed on it the rest of the day.

63.     When I came in on Monday, I sat down and started on the transcript and noticed that some of it had been changed.

64.     I was listening to the tape and re-reading what I had already typed, and the differences were not just mistakes of transcription.

65.     There was no password to use a computer just to type.

66.     I called Joanne and asked what I should do?

67.     Joanne told me to ask Doreen, and Doreen said just do it, and get it out and finish it.

68.     I said I was not signing it and Doreen said you don't have to sign it.

69.     I finished and started to print it off and was walking to the printer, and Ms Sams was by the printer.

70.     I said I would make copies, and she said I don't need a copy, just sign it an put a copy on my desk.

71.     I told her I would not sign it and Ms Sams just said put it on the desk.

72.     I have not seen the transcript I typed nor listened to the tape, because as far as I know, they were not produced in discovery.

Ex A

Monday Morning Meeting, October 27th

73.    In the staff meeting Monday morning, October 27, Ms. Sams got irate and was yelling at the whole staff

74.    Ms. Sams indicated she was upset with our "behavior."

75.    Although the specific problem about which Ms. Sam's was speaking related to an envelope submitted for a sealed bid that was not processed in a timely manner by Phyllis Mills, she yelled at Thelma Brooks.

76.    Ms. Sams said if we did not want our jobs, she would find someone who did.

77.    The envelope related to the bidding process.

78.    I did not have direct responsibility for any part of the biding process.

79.    Ms. Sams said that if we did not act as a team she would fire us all.

80.    After the meeting some of the other staff members prepared a grievance about the mistreatment.

81.    I signed the grievance on October 30, 2003.

82.    Phyllis Mills did not sign the grievance even though she was subjected to the same treatment.

83.    I noticed that Phyllis Mills went to lunch with Ms. Sams quite frequently.

84.    I did not see the other employees go to lunch with Ms. Sams.

Agreeing to Do What Was Asked About the Power Cord

85.    Near the end of October Maritza Rodriguez wanted to move some office furniture and the move needed to be accomplished to accommodate the placement of a power cord to a printer.

86.    Maritza was pregnant, and her back and her feet hurt.

87.    Maritza needed some help.

7

Ex A

88.     Moving the furniture was not my idea and the furniture was not in my office, and I was helping someone who had been there longer than I had.

89.     Moritza and I could not figure out how to get everything fitted into the available space and accommodate the power cord.

90.     Mr. Brooks came by and commented about the cord.

91.     Mr. Brooks, who does not work in the same office, helped us for a short period, and then he left because he had to go some place.

92.     Ms. Sams came in and it was obvious that the furniture was being moved.

93.     One of us pointed out and mentioned the cord, and told her that we don't know what to do with the cord, and that we were having trouble figuring out where everything should go.

94.     Ms. Sams reflected concern over the cord.

95.     I then said, "Mam, we'll move it however you like."

96.     Ms. Sams said if you can't figure it out, put the furniture back the way it was.

97.     I helped Mariza for awhile and then she and others finished putting it back

98.     I did not say the comment sarcastically, I was asking for guidance.

99.     I said it in a straightforward manner.

100.    After we moved the furniture I went to Ms. Sam's office and asked if she wanted to check what we had done, but she seemed fine with the fact that it had been moved.

101.    Ms. Sams did not make any comment about what I had said.

The Capri Pants Did Not Violate the City Formal Dress Code

and I had no Notice Otherwise

Ex A

102.    On about November 4, 2003,  I wore capri pants to work.

103.    The capri pants are not made from denim.

104.    The cuffs on the pant legs end a little less than halfway between my knees and ankles.

105.    The cuffs on the legs extended about six inches below my knees.

106.    The capri pants are a cotton floral print.

107.    When I came into work, Deborah Williams, or it could have been someone else, called me over and
told me that Ms. Sam's does not allow capri pants.

108.    Doreen then said that Ms. Sams would not let me wear capri pants.

109.    I asked if it was in the code book, because I didnt' think capri pants were mentioned in the City's
dress code.

110.    I was not wearing jeans.

111.    After they told me that Ms. Sam's did not want employees wearing capri pants, when Ms. Sms
came in that day, the first tme I saw her, I brought it up, that I had been told that I should not wear capri
pants.

112.    Ms. Sams said let me put my stuff down and I'll talk to you later.

113.    Ms. Sams called me into her office a few minutes later and I apologized repeatedly.

114.    Ms. Sams said it's OK.

115.    I offered to go home an change if she wanted me to.

116.    She said don't worry about it, go back to your desk and just don't do it again.

IFAS Training

117.    On November 11th, because I was a new employee and needed more training about how things

9

Ex A

worked, Ms. Sams directed me to attend the IFAS class.

118.    IFAS was the computerized requisition system, but the class addressed other matters related to purchasing goods and services for the County.

119.    There were employees in the IFAS class from the other departments whose requisitions the Purchasing Department handled.

120.    In the class, led by Ms. Sams, the procedures were discussed for the departments to requisition or seek payment for goods or services, or other things that they wanted.

121.    Written materials were passed out for the attendees to use and read that had the county policies and procedures about how requisitions and payments were made in certain situations for different requests.

122.    During the class, it had become informal and people were talking and asking questions, and Ms. Sams was addressing a question about how a department arranges a gift certificate or award to an employee in a department.

123.    Ms. Sams said that all requests to pay for gifts, awards ot things like that that a deprtment wanted to give an individual employee, should be brought to the Purchasing Department, and brought to Ms. Sams who would process it.

124.    The city-county has a Payroll Department, which deals with payments to the employees and what might be income to the employee.

125.    I was looking through the materials to find the section about this kind of payment and noticed a section that indicated that these kinds of requests for payments, gifts or bonuses to employees should go to the Payroll Department, apparently because the money from the city was going to end up in the employee's control, and might amount to pay or other benefit, and the Payroll department needed to know what monies

10

ExA

ended up in hands of employees, while our department kept track of monies that went to outside vendors.

126.   I spoke out and said that's not what this says, referring to the materials.

127.   Miss Sam's stopped and looked at me, and the room got quiet.

128.   She looked angry.

129.   I thought the manner of processing the requests stated by Ms. Sams sounded illegal because she described a method of taking petty cash to buy individuals awards, that was not consistent with what was written.

130.   Ms. Sams said she would talk to me about it later, but she did not.

131.   During the class Ms. Sams did tell us that sealed bidding information was confidential.

132.   There was no confidential bid information discussed in that class, and there was only some general information about a vendor or two, some problems with their goods or services, I did not and do not recall the names or the problems, as a new employee, learning how to do the job, and hoping to keep my job, I was concerned if I received a request from a department for a gift certificate, or award or some benefit for an employee, whether it should be referred to the Payroll department or to Ms. Sams.

Conversation After the IFAS Class

133.   After the IFAS class, I went back to the office to ask my trainer, Joane Peredo about the question I had asked in the training about the appropriate way to handle a request by a department to get city funds to buy an award for an employee or give then a cash award, or similar award or gift.

134.   I told Joane that Ms. Sams had said that those requests should go to her and I pointed out to Joane that the policy said that the request should go through Payroll, and I asked her what I was to do.

135.   Ms. Sams' office was within hearing distance of where I was talking to Joane or Doreen, so based

11

Ex A

on everything I know now, Ms. Sams apparently heard me discussing the question I had raised in the class.

136.    Ms. Sams did not say anything to me at the time.

137.    If I had been talking about confidential information at a time or place or to someone I should not have been talking to, she did not stop me or confront me to keep me from further talking about confidential information.

138.    While I asked a question that related to a question from a person in user department who wanted to now about the appropriate procedure to seek reimbursement for an award or gift, I was not talking about confidential information.

139.    The topic of what Ms. Sams overheard was not about confidential information, but Ms. Sams was sensitive about the fact that in the meeting I had pointed our that the written material conflicted with what she was saying, and that apparently she took it that I was questioning her, on one or more levels, including race and her integrity.

140.    That I did not stand in the middle of the office and reveal genuinely confidential information.

141.    I did not reveal any information that was not public information about the government, and I did not even mention the department that had asked the question about the gift or award requisition process.

The Termination Meeting

142.    The next day, November 12, 2003, Ms. Sams called me into her office, and told me that I was being let go.

143.    Mr. McCauley was present.

144.    I asked her why a couple of times, and she just said she did not have to give me a reason, that we no longer need your services.

E ω A

145.    I told her I had been a good employee, that I thought this was wrong, and I said I tink you are firing me because you don't like me.

146.    Ms. Sams did not mention anything that she claimed I had done wrong.

147.    Ms. Sams did not mention that she had overheard me say something that I shouldn't have, that would have been legitimately restricted from public information or that was not legitimately part of my training.

### Maritza and Joane Had More Task and Responsibility than the Black Workers

148.    While there was a general hostile work environment, the environment seemed harsher for me, and lighter skinned women, Maritza and Joane.

### Excellent Performer and Got Along Well With the Others

149.    I was an excellent worker, technically proficient, and got along well with the other employees in the office.

150.    My immediate supervisor, Doreen Holmes, never counseled me nor advised me that I had been doing anything wrong.

151.    None of the other employees ever made any complaints about me to anyone.

### Harsher Treatment

152.    Ms. Sams would not let me open my window and the other employees could.

153.    In about the third week I was told by Ms. Sams that my food was "stinky" and that I could not bring it into the office, where everyone else brought their food.

13

Ex A

154.  Every day, I was watched and examined by Ms. Sams, for more than my work performance.

155.  She made me feel like I had to watch every word I said.

Submitted this    day of December, 2007.

_____
Amy J. King

Prepared by:

John P. Batson
P.O. Box 3248
Augusta, GA   30914-3248

Phone  706-737-4040
Fax      706-736-3391

14

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

AMY KING,                          )
                                   )
            Plaintiff,             )   CIVIL ACTION
                                   )
      vs.                          )   FILE NO. 106-CV-148
                                   )
CITY OF AUGUSTA, GEORGIA, OF       )
AUGUSTA-RICHMOND COUNTY,           )
through its Mayor, ROBERT          )
YOUNG, individually and in         )
his official capacity, and         )
its Commissioners in their         )
official capacities, and GERI      )
SAMS, individually and in her      )
official capacity as the           )
Director of Purchasing for         )
the City of Augusta, Georgia,      )
                                   )
            Defendants.            )
_____)

DEPOSITION OF

AMY JEAN KING

August 20, 2007
3:00 p.m.

Conference Room
701 Greene Street
Augusta, Georgia

Rufus L. Hixon, RPR, CCR-A-75

*Prestige Reporting*

**Page 2**

**APPEARANCES OF COUNSEL**

On behalf of the Plaintiff:

JOHN P. BATSON, Esq.
Law Office of John P. Batson
Milledge Avenue
Augusta, Georgia  30904

On behalf of the Defendants:

DANIEL W. HAMILTON, Esq.
ANDREW MACKENZIE, Esq.
Shepard, Plunkett, Hamilton, Boudreaux &
   Tisdale, LLP
701 Greene Street
Augusta, Georgia  30901

Also present:

Geri Sams

- - -

**Page 3**

**INDEX TO EXAMINATIONS**

| Examination | Page |
|---|---|
| Cross-Examination by Mr. Hamilton | 7 |
| Direct Examination by Mr. Batson | 195 |

- - -

**INDEX OF EXHIBITS**

| Defendants' Exhibits | Description | Page |
|---|---|---|
| 1 | Augusta-Richmond County Separation Notice, Bates number 000037 | 32 |
| 2 | Augusta-Richmond County Job Description, Bates number 000346 | 34 |
| 3 | Application for Employment, Augusta, Georgia, Human Resources Department, Bates numbers 000004 and 000005 | 38 |
| 4 | Augusta, Georgia, New Hire Notification/Confirmation, Bates number 000003 | 40 |
| 5 | Augusta-Richmond County Human Resources Questionnaire, Bates number 000002 | 40 |
| 6 | 2004 Organization Chart for Purchasing/Printshop, Bates number 000165 | 42 |
| 7 | Acknowledgement of receipt of documents, 9-29-03, by Amy King, Bates number 000055 | 42 |
| 8 | Memo from Doreen Holmes to Mark Smith, October 7, 2003, subject: New Security for IFAS | 48 |
| 9 | Acknowledgment of Receipt, Augusta, Georgia, Employee Handbook, Bates number 000057 | 51 |
| 10 | Request for Transfer, Date November 11, 2003, Bates number 000161, two pages | 53 |
| 11 | Letter from Thomas E. Kessler, PG, MSE, October 20, 2003, to Ms. Maritza Rodriguez, Bates number 0003089 | 63 |
| 12 | Copy of check on account of Millennium Science & Engineering, Number 1108, to City of Augusta, Bates number 000390 | 63 |
| 13 | Signature Proof of Delivery, Airborne Express, Oct. 29, 2003, attention: Maritza, Bates number 000391 | 63 |
| 14 | MSE Fax Transmittal, 10/30/03, to Maritza, Bates number 000395 | 64 |
| 15 | Shipping receipt from Airborne Express to City of Augusta, Bates number 000396 | 64 |
| 16 | Signature Proof of Delivery from Airborne Express to City of Augusta, Bates number 000397 | 64 |
| 17 | Official Receipt from Millennium Science, Oct. 26, 2003, Bates number 000389 | 65 |
| 18 | Three-page document, Augusta-Richmond County Employee Time Cards, Bates numbers 000086 - 000088 | 65 |
| 19 | Attendees list for the IFAS Training, Date November 11, 2003, Bates number 000089 | 73 |

**5**

| | | |
|---|---|---|
| 1 | | |
| 2 | 20 | Memorandum from Purchasing Staff to Brenda Byrd-Pelaez, October 30, 2003, Bates number 000373      86 |
| 3 | | |
| 4 | 21 | Memorandum from Purchasing Staff to Brenda Byrd-Pelaez, October 30, 2003, Ex. 23-1      100 |
| 5 | | |
| 6 | 22 | 22-page document, handwritten transcription of Commissioners' Meeting, Ex. 23-1 - 22      108 |
| 7 | | |
| 8 | 23 | Augusta-Richmond County Separation Notice, November 17, 2003, Bates number 000031      130 |
| 9 | | |
| 10 | 24 | Augusta-Richmond County Separation Notice, November 17, 2003, Bates number 000092      131 |
| 11 | | |
| 12 | 25 | State of Georgia, Department of Labor, Separation Notice, Bates 000032      132 |
| 13 | | |
| 14 | 26 | Charge of Discrimination by Amy King, February 10, 2004, Bates number 000071      132 |
| 15 | | |
| 16 | 27 | Three-page letter from Amy King to EEOC, March 28, 2004, Ex 11 4/6   141 |
| 17 | 28 | Three-page letter from Amy King to EEOC, March 28, 2004, Ex 11 1/6   143 |
| 18 | | |
| 19 | 29 | Six-page document, letter to Ms. Sylvia Broden, EEOC, from Vanessa Flournoy, Bates numbers 000095 - |
| 20 | | 000100      144 |
| 21 | 30 | 31-page document, job search documents      144 |
| 22 | | |
| 23 | 31 | Two-page handwritten document To Mr. Batson, Ex. 22/1-2 & Ex. 22/2-2   145 |
| 24 | 32 | Letter to Ms. Silvia Broden, EEOC, from Amy King, July 1, 2004, Ex.3   151 |
| 25 | | |

**6**

| | | |
|---|---|---|
| 1 | 33 | Letter to Amy J. King from William B. Fenton, Employment Litigation, |
| 2 | | Dec. 14, 2004, Ex. 1      154 |
| 3 | 34 | Employment Record, Amy Jean King, Employee No. 10889, beginning |
| 4 | | 8-19-02, Bates number 000001      155 |
| 5 | 35 | 13-page document, letter from Brenda Byrd-Pelaez to Ms. Deborah Williams, |
| 6 | | Friday, June 4, 2004, beginning Bates number 000492      155 |
| 7 | | |
| 8 | 36 | 13-page document, Augusta Notice of Disciplinary Action Form, beginning Bates number 000386      159 |
| 9 | | |
| 10 | 37 | Multi-page document, file from US EEOC, top letter dates January 9, |
| 11 | | 2006, to Stephen E. Shepard from S. Robert Royal      194 |
| 12 | | |
| 13 | | |
| 14 | | (Original Exhibits 1 through 37 have been attached to the original transcript with |
| 15 | | photocopies provided to counsel.) |
| 16 | | - - - |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

**7**

1    MR. HAMILTON:  Same stipulations as
2  before?
3    MR. BATSON:  Yes.
4    MR. HAMILTON:  Ms. King, my name is Dan
5  Hamilton. I represent the consolidated
6  government of Augusta-Richmond County and
7  Ms. Sams in this action that you filed. I am
8  going to ask you to be sworn, and we will go
9  over some other preliminary matters.
10    AMY JEAN KING,
11  having been duly sworn, was examined and testified
12  as follows:
13    CROSS-EXAMINATION
14  BY MR. HAMILTON:
15    Q.   Ms. King, I intend to ask you a series of
16  questions today, some of them will be general in
17  nature, about you and your background, and some will
18  be specifically designed to elicit responses
19  relating to the claims or defenses that relate or
20  pertain to the factual circumstances in this case.
21  Okay?
22    A.   Yes, sir.
23    Q.   If you don't understand my question at any
24  point, please let me know, and I will try to do
25  better and ask a better question. If you give an

**8**

1  answer, I would like to have an understanding that
2  you understood my question. Is that fair enough?
3    A.   I will try; yes.
4    Q.   And, like before, these are just sort of
5  housekeeping things usually I go through with most
6  depositions, but it will be helpful if you can
7  provide verbal responses rather than non-verbal
8  responses, and we will try not to step on each
9  other, so to speak, when we are speaking or
10  listening so that we have a pretty clear record of
11  your testimony.
12    A.   Yes, sir.
13    Q.   I will start with some general questions
14  about you. First, tell me your full name.
15    A.   My name is Amy Jean King.
16    Q.   How do you spell "Jean"?
17    A.   J-e-a-n.
18    Q.   Ms. King, do you have relatives in the
19  Augusta area?
20    A.   No, sir.
21    Q.   Where do your parents live, if they are
22  living?
23    A.   In Florida.
24    Q.   Okay. Do you have siblings in this area?
25    A.   No, sir.

73

1 big word.

2 Q. Do you have any problems with the way she

3 communicated with you on that occasion?

4 A. No.

5 Q. I am going to show you a document --

6 MR. HAMILTON: I will mark it as D-20. I

7 think it's the same thing as Plaintiff's Exhibit

8 5.

9 (Defendants' Exhibit 19 was marked for

10 identification.)

11 Q. (By Mr. Hamilton) This is the attendees

12 list for the November 11th IFAS training meeting.

13 Are you familiar with that document?

14 A. Yes; I think so. Can I also say that the

15 work environment was hostile in general. There

16 were -- there was a feeling of intimidation in

17 there, and conversations would stop when she walked

18 into the office. Individually we did not have harsh

19 words one to another.

20 Q. You and Ms. Sams?

21 A. Me and Ms. Sams. Except for the day of

22 the petty cash meeting.

23 Q. The IFAS meeting?

24 A. (Nodded head up and down.)

25 Q. Do you recall what time of day that

74

1 meeting occurred, I think you said you did not,

2 whether it was before lunch or after lunch?

3 A. I don't remember, sir.

4 Q. Do you recall any of the individuals who

5 attended the meeting?

6 A. I knew none of them except Ms. Sams. I

7 think one of the other girls was in the meeting with

8 me.

9 Q. Who was that?

10 A. I think Thelma was there with me.

11 Q. Thelma?

12 A. I think so.

13 Q. Why were you and Thelma Brooks in that

14 meeting?

15 A. To learn the same things as the other

16 girls were learning.

17 Q. You, obviously, were fairly new to the

18 department at that time; is that right?

19 A. Yes.

20 Q. This was educational for you?

21 A. Yes.

22 Q. You have heard Ms. Sams testify earlier

23 today about the directive she gave and the

24 confidentiality she imposed during that meeting,

25 correct?

75

1 A. I heard her testify to that; yes.

2 Q. What is your version of how that happened?

3 MR. BATSON: Objection to form. Go ahead.

4 A. I don't remember the meeting being about

5 vendors. I remember the meeting being about the

6 training procedures. We all had pamphlets in front

7 of us about the IFAS stuff, training and procedures.

8 I had a book on the County rules and government

9 procedures, and I was leafing through it during the

10 training. Somebody brought up a question about

11 petty cash, how they handled petty cash. Ms. Sams

12 explained that -- what I can remember is that

13 Ms. Sams explained: "You give them to me. They go

14 through me." And they were discussing how would

15 they pay -- how would they pay for gift certificates

16 if somebody bought a gift certificate. I don't

17 recall any names being mentioned. I wouldn't have

18 known who the names were for or who was who or heads

19 of what department. I happened to be reading down

20 the column where it said how you are supposed to

21 deal with gifts to employees, it was opened to that

22 page, and I was reading it, and I noticed that what

23 she described the way that was done was not the way

24 that it was written in here, and I said that out

25 loud.

76

1 Q. How did you say it?

2 A. I said: "That's not what this says."

3 Q. Okay. And what happened then?

4 A. Ms. Sams turned around and looked at me,

5 and the whole meeting got quiet.

6 Q. Did she say anything at that point?

7 A. No. She just looked at me.

8 Q. So, you, basically, disagreed with your

9 boss in an open meeting?

10 A. I read verbatim the small paragraph.

11 Q. Which disputed something that your

12 department head, Ms. Sams, had just told the group;

13 is that correct?

14 A. In my opinion, it was not the way that was

15 described here, that was described in the

16 regulations, in the rules.

17 Q. Would you agree --

18 A. The policies.

19 Q. -- at least that your representation was

20 inconsistent with the representation Ms. Sams had

21 just made while leading this meeting?

22 MR. BATSON: Objection to the form of the

23 question. Go ahead and answer.

24 A. I thought it sounded illegal.

25 Q. (By Mr. Hamilton) You thought it sounded

77

1   illegal?
2       A.   Uh-huh.
3       Q.   Why?
4       A.   It didn't match what was described in the
5   procedures of the code that I was reading.
6       Q.   And that's the only reason?
7       A.   That was a good reason.
8       Q.   The fact that it didn't match you thought
9   made it illegal?
10      A.   Well, she had described a method of taking
11  care of the petty cash that was not consistent -- or
12  paying -- buying gift certificates for individuals
13  that was not the way that buying -- that giving
14  awards to individuals was described in the handbook
15  or in the policy manual.
16      Q.   Do you recall what she described?
17      A.   Not exactly.  It struck me at the time.
18      Q.   Do you recall what's in the manual?
19      A.   Not exactly.
20      Q.   You just recall that there was, in your
21  mind, there was an inconsistency?
22      A.   Yes, sir.
23      Q.   And you pointed that out publicly?
24      A.   Yes, sir.
25      Q.   And that was, apparently, the end of the

78

1   discussion on that point during the meeting; is that
2   correct?
3       A.   Yes, sir.
4       Q.   Did you at any point have any further
5   discussion with Ms. Sams about that issue?
6       A.   She said we would talk about it later.
7       Q.   And did you?
8       A.   Not that I recall.
9       Q.   Did you discuss that with anyone else in
10  the department subsequently?
11      A.   I think I asked one of the girls, but I
12  can't recall who, if that was the way that they did
13  it or was I wrong or -- I was trying to learn
14  information.  I'm a public servant.  I'm also a
15  taxpayer.  So, if it's not being done right, why
16  isn't it being done right?  Or is this the way that
17  it actually is done and I was misinterpreting this
18  paragraph?
19      Q.   Okay.
20      A.   I asked a question.
21      Q.   This is in one of the claims in your
22  complaint -- have you read your complaint?
23      A.   Not all the way through, no, sir.
24      Q.   There's an allegation you make of fraud,
25  you use the words "fraud, waste, and abuse".  Is

79

1   what we are talking about concerning the petty cash
2   part of the fraud, waste, and abuse you are
3   referring to there?
4            MR. BATSON:  I would have to say that
5        might call for a legal conclusion.  She may know
6        it in other terms.  But, at any rate, subject to
7        that objection.
8       A.   I don't know if there was abuse.  I'm
9   saying what she said didn't match what was written.
10      Q.   (By Mr. Hamilton)  I understand.  And is
11  the cash reimbursement issue generally something
12  that you are complaining about in this lawsuit?
13           MR. BATSON:  Once again, that may call for
14       a legal conclusion, part of the claims.  What
15       happened in the 11/11 meeting is part of
16       protected activity, round, straight, simple
17       terms.
18      A.   So, I don't know how to answer that.
19      Q.   Fair enough.
20           MR. BATSON:  Neither do I.
21      Q.   (By Mr. Hamilton)  Is there anything from
22  that November 11 meeting, other than the cash
23  reimbursement issue, that you felt to be at all
24  problematic?
25      A.   No, sir.

80

1       Q.   And you have no recollection whether
2   Sidney's was mentioned?
3       A.   I do recall talking about -- hearing about
4   Sidney's, because I used to be a police officer, and
5   I knew that they got uniforms from Sidney's, so I
6   recall people saying:  "Sidney's is a mess," and I
7   said:  "Sidney's is a mess.  When you walk in there
8   the place is a mess."
9       Q.   You recall that from the meeting?
10      A.   No.  This was talked about before any
11  meeting happened.
12      Q.   My question is --
13      A.   With Phyllis and Thelma.
14      Q.   I understand.  My question, though, is:
15  From the meeting itself on November the 11th --
16      A.   I do not remember mentioning any vendors
17  or hearing vendors mentioned in that meeting.
18      Q.   All right.  And, similarly, do you have
19  any recollection of any department heads whose names
20  may have been mentioned during that meeting?
21      A.   No, sir.  I don't know who -- I didn't
22  know any of the people in that meeting.  I knew the
23  girl that was with me and Ms. Sams; those were the
24  only two.  The department head thing and the petty
25  cash and that, it meant nothing to me.  It meant

**81**

1  some internal thing that they were trying to hash
2  out, a procedure. I didn't assume that it was --
3  that there was something fishy going on.
4      Q.   Did you do anything else or say anything
5  else in that meeting that you believe -- that is
6  bothersome to you as you sit here today?
7      A.   That was bothersome to me? No, sir. I am
8  aware of what is public, you know, supposed to be
9  public information.
10     Q.   Well, tell me what you think you are aware
11 of in that regard.
12     A.   What I think I'm aware of? You are
13 working in a public office. Everything is open
14 record, public record. All the officials and all of
15 their salaries, including mine, are public record.
16 The only thing I would even consider to be stuff
17 that you weren't supposed to talk about was the
18 vendor information, and I didn't see any of that. I
19 didn't -- I wasn't in charge of the bids. I didn't
20 know who the bidders were. I didn't know all the
21 names of all the vendors. I don't even think I was
22 allowed in the vendors' meetings. I don't recall
23 being allowed to be in the vendor meetings or in on
24 the bid process or any of that. I wasn't included.
25 That wasn't, as far as I knew, that wasn't my job.

**82**

1  It was Phyllis's job.
2      Q.   Okay.
3      A.   I did work the filing cabinet, I fixed the
4  filing cabinet, but I didn't go through and stare at
5  each individual file or learn the names or anything
6  else. They were just files.
7      Q.   Did you complain or report any concern
8  about this meeting to anyone?
9      A.   I'm sort of a Boy Scout. I probably would
10 have if I had gotten proof that something was going
11 on illegally.
12     Q.   Okay. I'm not asking you to be a warrior
13 or a Boy Scout, but you do have a whistleblower
14 claim in this lawsuit; do you understand that?
15     A.   Yes.
16     Q.   In your mind, to whom did you blow a
17 whistle?
18     A.   Joane and Doreen.
19     Q.   Anyone else?
20     A.   No, not that I know of.
21     Q.   And Joane Peredo and Doreen Holmes were
22 co-workers of yours --
23     A.   Yes.
24     Q.   -- at the time --
25     A.   My supervisors.

**83**

1      Q.   -- you discussed it with them?
2      A.   They were my supervisors.
3      Q.   When did you communicate with them about
4  this?
5      A.   When did I communicate about what? I
6  don't understand what you're asking me.
7      Q.   Okay. I thought you just testified that
8  you told your two supervisors that you had some type
9  of problem with the discussion in that IFAS meeting
10 concerning petty cash reimbursement. Is that not
11 your testimony?
12     A.   Yes.
13     Q.   That is your testimony, right?
14     A.   Yes.
15     Q.   Okay. All I'm doing now is asking you
16 when you told them that in relation to when the
17 meeting occurred.
18     A.   I don't remember which of the two I told,
19 I think it was Joane, that I think I made a mistake
20 in the meeting in pointing out the differences in
21 how things were actually done and what the policy
22 said.
23     Q.   And what did Joane say in response?
24     A.   She said: "Just leave it."
25     Q.   And did you?

**84**

1      A.   Yes.
2      Q.   You had no further discussion with
3  Ms. Sams or Joane Peredo or Doreen Holmes or anyone
4  else about that issue?
5      A.   I told my mother.
6      Q.   Okay. Anyone else?
7      A.   And my boyfriend.
8      Q.   All right. When did you tell your
9  boyfriend?
10     A.   That afternoon.
11     Q.   And tell me again his name.
12     A.   John Kruger.
13     Q.   The same gentleman you mentioned earlier?
14     A.   No.
15     Q.   If I wanted to try to locate Mr. Kruger,
16 how would I do that?
17     A.   He's here in Augusta. He works for the
18 Georgia Department of Transportation -- no -- the
19 Public Safety Commission. Sorry. He's a police
20 officer.
21     Q.   Where is his office; do you know?
22     A.   He has an office at the weigh station on
23 I-20.
24     Q.   And, except for Ms. Peredo and Ms. Holmes,
25 you didn't talk about this issue with anyone else

85

1  with the Augusta-Richmond County government, your
2  then employer; is that correct?
3      A.    I don't think so; no.
4      Q.    Okay.
5          MR. BATSON:  "I don't think so, yes", one
6  of the two.
7          MR. HAMILTON:  Let's be clear about that.
8      Q.    (By Mr. Hamilton) Those are the only
9  people from the government, your employer, that you
10  recall talking to about this; is that correct?
11     A.    Yes, that I recall.
12     Q.    Okay.
13     A.    I didn't -- no, that's all, that's all I
14  remember.
15     Q.    All right.  Is there anything else about
16  the November 11 meeting that was problematic to you
17  that we have not discussed, you and I, today?
18     A.    That I thought was a problem?
19     Q.    Yes.
20     A.    No.  Other than that I was afraid that
21  maybe I embarrassed Ms. Sams by saying, you know, by
22  pointing that out in the meeting.  I knew that she
23  was angry with me.  Everybody in the room, I think,
24  knew that she was angry with me.
25     Q.    Substantively, in terms of what was

86

1  actually discussed and presented during this
2  training session, this meeting, there was nothing
3  else that you found at all troubling; is that
4  correct?
5      A.    She gave me a dirty look across the room,
6  and the meeting stopped.
7      Q.    That's not what I am asking.
8      A.    That's troubling.
9      Q.    I'm not trying to be difficult.  What I am
10  asking you is in terms of the subject matter,
11  whatever was being discussed substantively during
12  the meeting.
13     A.    I don't remember everything that was
14  discussed the meeting, but, no, it didn't --
15  nothing else bothered me.
16          MR. HAMILTON:  We are up to number 20?
17          (Defendants' Exhibit 20 was marked for
18  identification.)
19     Q.    (By Mr. Hamilton) Ms. King, the
20  regulations that you are testifying about that you
21  say were inconsistent with what Ms. Sams had said,
22  do you have those with you?
23     A.    No; I don't.
24     Q.    You have brought with you, it looks like a
25  three-ring binder, with a copy of the --

87

1      A.    Handbook.
2      Q.    -- of the handbook?
3      A.    Yes, sir.
4      Q.    But you don't have these other materials
5  that we are talking about now?
6      A.    No.  They were in the training meeting.
7      Q.    Can you describe them?  Was it one piece
8  of paper or a book?
9      A.    A booklet.
10     Q.    A booklet?
11     A.    Yes.  It was a bunch of pieces of paper
12  stapled together.  I think it was the County code
13  book.
14     Q.    Okay.  So, you think you were referring to
15  something in the Augusta-Richmond County Code?
16     A.    Yes.
17     Q.    As we sit here today, you think it had to
18  do with cash reimbursements?
19     A.    Awards to individuals.
20     Q.    What do you mean?
21     A.    I mean personal awards to individuals.
22     Q.    Like procurement-related awards to
23  vendors?
24     A.    No.  No.  I don't recall anything about
25  vendors in that meeting.

88

1      Q.    Okay.
2      A.    We were only learning, as far as I
3  remember, we were learning that day about the
4  procedures for procurement.
5      Q.    I understand.
6      A.    And the question came up about reimbursing
7  people from petty cash for gift certificates.
8  That's what was talked about.
9      Q.    And you don't recall any directive about
10  being confidential about something that was being
11  discussed outside?
12     A.    No.
13     Q.    You just don't recall that one way or
14  another?
15     A.    No; I don't.  No.  That's all I am going
16  to say on it.  Otherwise, it would be speculation
17  speculating what she meant by that or what she meant
18  by what I think she -- what I think she said.
19     Q.    You think she said something that you
20  haven't already mentioned?
21     A.    I don't remember her specifying any
22  information to be confidential.
23     Q.    Okay.  Do you recall how the meeting
24  concluded?
25     A.    No; I don't.

**89**

1    Q.    Do you recall being outside the meeting
2  shortly after the meeting or after the meeting?
3    A.    I don't recall the events that she
4  described earlier today, me standing in the hallway
5  and talking about all the stuff that had just gone
6  on in the meeting; no, I do not remember it that
7  way.
8    Q.    Do you have any memory of it?
9    A.    I would have gone back to my desk with
10  Thelma.
11    Q.    Okay. I appreciate that. And I want to
12  be real careful about this with you. I understand
13  your testimony that you would have gone back to your
14  desk with Thelma, but I'm asking you if you remember
15  specifically one way or another what exactly you
16  did?
17    A.    I think I went back to my desk with Thelma
18  and Phyllis. There were a lot of people in the
19  office from the meeting.
20    Q.    Do you recall one way or another whether
21  you discussed outside the meeting room any of the
22  subject matters in the meeting?
23        MR. BATSON: Any subject matter of the
24    meeting?
25        MR. HAMILTON: Right.

**90**

1        MR. BATSON: Objection to the form of the
2    question.
3    A.    I think I discussed with Joane that I made
4  a mistake in the meeting.
5    Q.    (By Mr. Hamilton) Okay, do you recall
6  mentioning anything about vendors or department
7  heads or cash reimbursements outside the meeting
8  area?
9    A.    That's two separate things. That's two
10  separate questions. The vendors and stuff, no, I
11  did not talk about the vendors outside the meeting.
12  I didn't have any kind of privileged information at
13  all about the vendors, none. I didn't know the
14  specific ones, who was doing what bid, and I don't
15  remember them now. There were vendors coming and
16  going in there, but I wasn't talking about them.
17  Sidney's came up before that meeting, and I didn't
18  talk about Sidney's after that.
19    Q.    Do you recall whether you talked about the
20  cash reimbursement issue after the meeting?
21    A.    I tried to explain it to Joane.
22    Q.    And physically where were you located when
23  you did that?
24    A.    I sat at my desk for a while, and then I
25  went and smoked with Joane.

**91**

1    Q.    Where was Joane?
2    A.    At her desk.
3    Q.    Which was in the same room with you?
4    A.    No. It's near the conference room. It's
5  in front of the conference room. I was not standing
6  out of the bounds of -- there are two doors in
7  purchasing. I was standing inside the inner door.
8    Q.    I understand. And that would be roughly
9  adjacent to the entryway to Ms. Sam's office and her
10  office door; is that correct?
11    A.    Yes.
12    Q.    Would it be fair to say it was in earshot
13  of Ms. Sam's office?
14    A.    Yes. She may have heard me talking about
15  the paragraph in there.
16    Q.    The paragraph regarding cash
17  reimbursements?
18    A.    Yes. She may have heard me talking about
19  that. I can understand where she could have heard
20  that. It wasn't confidential information. It was
21  written in the public record. And so were the
22  procedures that she was teaching everybody that day
23  to follow. Nothing confidential.
24    Q.    Well, if Ms. Sams gave you a directive not
25  to discuss it outside the parameters of that office,

**92**

1  the meeting room --
2    A.    Sir, that is not --
3    Q.    I understand. Let me finish my question.
4  But if she gave you such a directive --
5    A.    Uh-huh.
6    Q.    -- would you agree that it would be
7  inappropriate and improper for you to violate that
8  directive?
9    A.    To discuss procedures with other
10  purchasing agents? No, sir, I did not violate any
11  rule.
12    Q.    Okay. I understand your testimony.
13  That's not quite what I'm asking.
14    A.    Just because someone calls something
15  confidential information doesn't make it
16  confidential information.
17    Q.    If Ms. Sams gave you a directive not to
18  discuss a certain topic, any topic, outside the
19  closed meeting and you violated that directive, is
20  it your position that it is not improper for you to
21  do that, as an employee, if you believe it's not
22  confidential information?
23        MR. BATSON: Objection, objection to the
24    form of the question, calls for a legal
25    conclusion.

93

1    A.   Taken out of context of that, no, you are
2    not supposed to do what you are told not to do.  If
3    somebody tells me to do something, that's what I do.
4    If somebody tells me not to do something, that's
5    what I do.
6    Q.   (By Mr. Hamilton)  I am trying to
7    reconcile your testimony there with --
8    A.   There's no reconciliation.  It is what it
9    is.  I did not discuss information that she told me
10   not to discuss.  There was no confidential
11   information involved.  I didn't talk about any
12   vendors.
13   Q.   But you admit that you did talk about the
14   cash reimbursement issue?
15   A.   I have to ask a question.
16   Q.   No, ma'am.  Let's try to have you answer
17   questions, respectfully.
18        MR. BATSON:  You have a right to explain
19   your answer, but you can't ask him a question.
20        THE WITNESS:  All right.  I lost my train
21   of thought.
22   Q.   (By Mr. Hamilton)  I think my question to
23   you was: Will you admit that you did discuss after
24   the meeting, outside the meeting room, the issue of
25   cash reimbursements?

94

1    A.   I do not remember being told that public
2    policy was not to be discussed outside of the four
3    walls of that conference room.
4    Q.   Fair enough.  I am just simply asking you
5    if, in fact, you did discuss the cash reimbursement
6    issue after the meeting was over in the area of the
7    office that you have described?
8    A.   With no names involved, I did discuss the
9    incident where I read that paragraph.
10   Q.   What else did you discuss?  Did you
11   discuss the policy itself?
12   A.   I didn't understand the policy.  I was
13   asking for clarification.
14   Q.   And to whom were you asking for
15   clarification?
16   A.   What I read in the thing and what Joane
17   knew, I asked her did I make a mistake.
18   Q.   Did you consider approaching Ms. Sams for
19   clarification?
20   A.   She told me that we would talk about it
21   later.  I was pretty sure that we were going to talk
22   about it later.
23   Q.   Did you consider approaching her?
24   A.   No, sir.  I was afraid of Geri Sams.
25   Q.   I'm not trying to put words in your mouth

95

1    here, but I do want to be clear about this with you.
2    It sounds to me as though you are taking the
3    position, it's your testimony today that, even if
4    you are given a directive not to talk about
5    something that you consider to be public information
6    and you do so, that you haven't done anything wrong?
7    A.   No, sir.
8    Q.   Is that what you're saying?
9    A.   No.  That's twisting words.
10   Q.   Well, help me understand what you mean.
11   A.   It doesn't -- I do not remember Ms. Sams
12   telling us in that room as a whole that every single
13   thing that she said in that conference room was
14   never to leave that conference room.  If I had been
15   given an order like that, I would have not talked
16   about one single thing that was said outside that
17   conference room.  When she was talking about
18   information inside the Purchasing Department, I
19   understood that I was not to talk about that stuff
20   that they consider vendor information and stuff like
21   that.  I understood that that was not to be given to
22   the public, that was not to be discussed in the
23   public forum for any reason.  I can understand why
24   competition and private bidding would be important
25   to the government, to the City government.  I did

96

1    not discuss that information.
2    Q.   And the confidentiality relating to that,
3    you could understand why the confidentiality would
4    be important as well?
5    A.   Yes; absolutely, I could.  I understand
6    what confidential information would be and why it
7    would be important to some vendors and to the City.
8    That's not what was brought out at that meeting.
9    Q.   We're on number 20.  I think this is an
10   exhibit.  That's the October 30th memorandum of
11   grievance, Bates number 373.  Are you familiar with
12   that document, Ms. King?
13   A.   Yes, sir.
14   Q.   Tell me about the facts or circumstances
15   involved with your signing Defendants' Exhibit 20.
16   A.   Thelma Brooks and Joane Peredo brought
17   this to me and said: "Will you sign this?"
18   Q.   Okay.
19   A.   And I read it, and I said: "Yes.  I agree
20   with everything in that."  And I signed it at the
21   bottom.  They had already included my name.
22   Q.   Okay.  Did you have any other discussion
23   about it with anyone prior to signing it?
24   A.   No; I did not.  You know, Thelma was upset
25   that day, and she was talking about writing a

Ex. C

## Amy King

| | |
|---|---|
| Hire Date: | September 29, 2003 |
| Separation Date: | November 13, 2003 |
| Pre-Interview Testing: | September 17, 2003 Letter mailed to Ms. King (Attachment 1) Copy of letter was sent to HR – Tamesha Jennings |
| Interview Date: | September 24, 2003 10:30 AM – Interviewers were: Geri A. Sams, Tamesha Jennings, Doreen Holmes and Joane Peredo (Attachment 2) |

During interview Ms. King was asked if she could begin to work on September 29, 2003 - She said 'Yes".

On the morning of September 25, 2003 she came in and told Doreen Holmes that she would not be able to work on October 2, 3 and 6 because she had to go out of town to attend her brother's wedding.

| | |
|---|---|
| October 2, 3, and 6 | Out of the Office to attend wedding (attachment 3) |
| October 13, 14, 15, 16 and 17 | Out of the Office Sick (Attachment 4) |
| | Time Cards from 10/25 to 11/21 (Attachment 5) |
| October 30 | Ms. King and Maritza Rodriguez rearranged the office furniture in the lobby to accommodate a new file cabinet. When I came in on Friday, October 31, I notice the change; I also noticed that they had run an extension cord through the metal file cabinet drawer. I asked them to call Charles to move the file because that presented a safety issue. When Charles came into the office he stated that he pointed that safety issue out to them on the day before and they did not listen to his advice. When the cord was removed I showed them the indention the drawer had already made. Ms. King commented we will move it any way you want it. I stopped her and said we are addressing a safety issue and they can arrange the office but within safety regulations. |
| November 3 and 4 | Training began on Word Perfect and Excel |

On November 4, Ms. King came into the office very Casually dressed. I called her into the office to speak with her concerning her attire and she stated that staff had already told her. Then I asked her if they covered dress attire in new


PLAINTIFF'S
EXHIBIT
5

000056

1

Ex C

employee orientation she replied yes and that she would dress appropriately in the future. I also told her that we do not wear jeans in this department unless we are cleaning, moving files or working on the weekend because we deal with vendors and this type of attire is not in keeping with a professional customer service oriented work environment. This was the only private conversation I had with Ms. King.

November 11

During IFAS training, we were discussing various departments' processes and procedure. During this training some confidential information was shared about vendors and departmental processes. I assured each person that what was said in this work session would remain confidential I asked Ms. Amy King and Ms. Thelma Brooks who were the Purchasing Technicians present not to do repeat the information shared by various departments because it was sensitive information. As soon as the meeting was over Ms. King stood in the middle office of the purchasing department and repeated the sensitive information that was shared in the training session.

See attached sheet for employees who were present at the workshop (Attachment 6) she violated a directive from her department head. We (Purchasing) deal with a lot of confidential information and I could not afford to have any employee take the confidential information received in this department lightly.

I spoke with HR expressing my concerns.

November 13

I went to HR, met with Mr. Moses McCauley, Employment Manager who advised me on how to proceed with the termination process. Mr. McCauley was present doing the exit interview of Ms. King.

All of the process and procedures were discussed with Ms. Vanessa Flournoy, Staff Attorney, and Ms. Brenda Byrd-Pelaez. Human Resources Director and Mr. Fred Russell, Deputy Administrator where all the details of the termination of Ms. King was disclosed. They all agreed with the termination process.

| Attachment 7 | E-mail confirming the termination of Ms. King and confirmation of my earlier conversation with HR earlier. |
| Attachment 8 | Memo to file, Ms. Pelaez and Mr. Russell |
| Attachment 9 | Separation Notice |

C:\CLIENT FOLDERS\king\King prima and pretext of prof reasons.wpd

## CERTIFICATE OF SERVICE

This is to certify that the undersigned attorney did this date serve a copy of the within and foregoing pleading upon all counsel of record by one or more of the following method(s):

☐  Depositing the same in a properly addressed envelope with adequate postage thereon to the following address(es):

    Mr. Daniel W. Hamilton

    Shepard, Plunkett, Hamilton,

    Boudreaux & Tisdale, LLP

    701 Greene Street - Suite 104

    Augusta, Georgia 30901

☐  E-mailing a copy to opposing counsel at: danhamil@mindspring.com.

☑  Hand delivering to the address listed above.

This 12th day of December, 2007.

      _John P. Batson_____

      John P. Batson

      Ga. Bar No. 042150

      Attorney for Plaintiff

Prepared by:

John P. Batson

303 Tenth Street

P.O. Box 3248

Augusta, GA  30914-3248

61